ALLA A. DAVENPORT

*v.*

MARY ANNA DAVENPORT et al.

[Filed July 1st, 1904.]

1. That a last will and testament has been legally executed and published by the testator, will not be decreed upon uncertain and unreliable testimony.

2. The contents of a destroyed will may be proved by the declarations of the testator regarding the same.

3. A divorce decree granted in another state of the United States will not be recognized in this state if it appears that in applying for such divorce the applicant fraudulently misstated or suppressed facts within his knowledge which would, if·the truth were known and disclosed, have adversely affected the judgment rendered, or if it appears that the applicant knew where the defendant resided, and yet no actual notice of the pendency of such suit was given to such defendant.

4. A mistaken conclusion, arrived at upon consideration of existing facts, is not an insane delusion, although the facts may not justify the conclusion.

5. An insane delusion is a fixed belief, based upon supposed facts, which exist only in the diseased imagination of the deluded person, persisted in against indisputable evidence of its falsity.

On bill, answer and proofs.

The bill of complaint in this cause is filed by one Alla A. Davenport, who claims to be the second wife and widow of Thomas C. Davenport, who died on the 17th day of February, 1903.

The bill makes defendants the children of the decedent, Thomas C. Davenport, born to him by Mary A. Davenport, who is alleged in the bill to be a former wife of said Thomas C. Davenport, and also makes defendant the said Mary A. Davenport, who is alleged to claim to be the widow of Thomas C. Davenport.

The bill states as the complainant's ground for relief the following circumstances:

Mr. Thomas C. Davenport resided at Collingswood, in the county of Camden. He died on the 17th day of February, 1903, possessed of considerable real and personal estate, situate in this state, Pennsylvania and New York. The bill alleges that on or about the 20th day of January, 1903, Mr. Davenport made and published his last will in the manner prescribed by the laws of this state; that by his said will, after making certain specific devises, he gave all the residue of his estate to the complainant, Alla A. Davenport; that he appointed Henry R. Tatem executor of said will, which, the bill of complaint alleges, is substantially in the words and manner set forth in the bill of complaint.

The bill further alleges that the testator, having made and published his said last will, caused it to be delivered to Henry R. Tatem, the executor named therein, for safekeeping. That afterwards, on the 16th day of February, 1903, while Mr. Davenport was sick and of enfeebled and unsound mind, and totally unfit and incapable of attending to business, and susceptible to false impressions, hallucinations and undue and evil influences, he was, by his son, Job P. Davenport, unduly influenced to send to the said Henry R. Tatem to return to him the said last will, and that upon the same being returned and delivered to Mr. Davenport he was, through the inducements and undue influence of his said son, Job P. Davenport, and others, induced and coerced to tear part of the will and deliver it up to his said son, who has kept, concealed or destroyed it, intending to defraud the complainant of her lawful rights, so that the last will cannot be probated.

The bill further shows that the defendants, children of Mr. Davenport, and their mother, have applied for letters of administration upon his estate; that the complainant has filed a caveat against the issuance of such letters, and that matter is still pending.

The complainant alleges that the last will and testament set forth in the bill of complaint was never revoked or canceled in

law. She prays that the defendant Job P. Davenport may be decreed to produce the said will in order that the same may be probated, or, if it be found that the said will has been destroyed, that the complainant may have the decree of this court, re-establishing it as the last will of said decedent, Thomas C. Davenport.

All the defendants, jointly and severally, answer the bill of complaint. The defendant Anna M. Davenport alleging that she is the lawful widow of the said Thomas C. Davenport and that her children are his heirs-at-law and next of kin.

They admit that the said Thomas C. Davenport is now deceased; that he died on the 17th day of February, 1903, seized of both real and personal estate, and they allege that he died intestate.

They deny that the decedent, Thomas C. Davenport, was ever lawfully married to the complainant, Alla A. Davenport, at any time, and they deny that she was his lawful wife at the time of his decease or at any other time. They deny that she is his lawful widow; on the contrary, they insist that the defendant Anna M. Davenport was lawfully married to the decedent, Thomas C. Davenport, on December 7th, 1865, in this state; that she was his lawful wife at the time of his decease and now is his lawful widow; that the defendants, Job P. Davenport, Mary A. Davenport and Lillian Davenport, are the children and only heirs-at-law and next of kin of the said Thomas C. Davenport, and that they were all born to him by his said wife and now widow, the defendant Anna M. Davenport.

The defendants admit that the said Thomas C. Davenport resided in the county of Camden, and that he was of sound mind. They deny that he made or published the last will set forth in the complainant's bill, and that he departed this life leaving any such will unaltered and unrevoked; on the contrary, they state the fact to be that he departed this life intestate.

They deny that any such will was delivered to Henry R. Tatem, or that while of unsound mind and incapable of attending to business, the decedent, Thomas C. Davenport, was unduly in-

fluenced to send for said will or to tear or destroy it or any part thereof. They deny that the said will was delivered to said Job P. Davenport, as alleged in the bill, and that it is being concealed or has been destroyed, with intent to defraud the complainant; on the contrary, they allege and insist that said Davenport departed this life intestate.

The defendants further say that, as the lawful widow and heirs-at-law and next of kin of said Thomas C. Davenport, they are entitled to all the real and personal property whereof he died seized and possessed, and they deny that the complainant has any right, title or interest therein, and also deny that she ever was the wife or is the widow of said decedent. They admit their application for letters of administration upon the estate of said Thomas C. Davenport, deceased.

The defendants further deny the jurisdiction of this court in the premises and say that the complainant has a full and adequate remedy at law, and they claim the same benefit as if they had demurred to the bill of complaint.

The cause came to a hearing on these pleadings.

*Mr. John G. Horner* and *Mr. Frank T. Lloyd,* for the complainant.

*Mr. Henry F. Stockwell* and *Mr. David J. Pancoast* (with whom was *Mr. Horace Rumsey,* of the Philadelphia bar), for the defendants.

GREY, V. C.

This cause has been well prepared and ably presented by counsel on both sides. It involves important questions, dependent to some extent upon the details of the evidence, a part of which I have found it necessary to quote.

In order to avoid confusion, it should be noted that the defendant named in the bill as Mary A. Davenport, and therein alleged to be the former wife of Thomas C. Davenport, is the same person who answers as Anna M. Davenport, insisting that she was the lawful wife and is now the widow of the decedent.

Thomas C. Davenport. She will be designated in this opinion as Anna Mary Davenport, the name under which she answers the bill of complaint.

The complainant alleges that the instrument which she seeks to have established by decree of this court, is the last will and testament of Thomas C. Davenport. The defendants, by their answer, in express terms, deny that any such will was made and published by Mr. Davenport.

This is the first point in the cause, and on this the burden of proof rests upon the complainant.

The complainant's second contention is, that the will which she alleges Mr. Davenport made and published has, through undue influence exerted upon him, or by reason of his own act, at a time when he was of unsound mind and incapable of transacting business, been revoked and canceled. The burden of showing the existence of these conditions must also be assumed and carried by the complainant.

I will consider the first point. Has the complainant shown, that the instrument which she seeks to have declared to be the last will and testament of Thomas C. Davenport, was by him duly made and published as his last will?

The bill of complaint alleges that on January 20th, 1903, Mr. Davenport executed the paper in question. As there set forth, the alleged will gives to his son, Job P. Davenport, a farm and vineyard near Aurora, New York; to his daughters, Mary and Lillian, two cottages at Island Heights, New Jersey; and to the complainant, Mrs. Alla A. Davenport, all the decedent's personal property, also his farm at West Collingswood, his farm and vineyard at Bluff Point, New York; his store property in Philadelphia, and all the residue of his real and personal estate, and appoints Henry R. Tatem executor.

The evidence does not define with precision the values of Mr. Davenport's property. The complainant states the real estate, in all, to be of the value of about $50,000 to $60,000, subject to mortgages of about $21,000, and that there was also personal property of considerable value. If Mr. Davenport made

the will set forth in the bill of complaint, it plainly gave to Mrs. Alla A. Davenport much the greater portion of his estate.

The statute prescribes that a will shall be in writing, shall be signed or the signature acknowledged by the testator, who shall declare such writing to be his last will, in the presence of two witnesses, who shall be present at the same time, who shall subscribe their names to such writing as witnesses, in the presence of the testator. *Gen. Stat. p. 3760 § 22.*

The usual mode of proof is to produce the writing before the court which is to receive the probate, call one or more subscribing witnesses thereto, and prove that each of these requisite statutory incidents has been performed. The paper having been thus produced and identified, it proves its own contents.

This method of proof is, of course, impossible, when the alleged will has been, as a physical fact, canceled and destroyed, and therefore cannot be produced. In such cases, when the beneficiaries under the canceled will claim that its destruction was by accident or mistake, or by the act of the testator when insane, they must carry the burden of proving the observance of the statutory requirements in the making and publication of the alleged will, and also what its contents were, and that its revocation was not brought about by the sane intent and the capable act of the testator.

The complainant in this case, in carrying this burden, has called as witnesses all the persons who were present on the occasion when she alleges Mr. Davenport made the will, which she asks this court to establish. They were Mr. Meeteer, a member of the bar, who drew the paper and signed it as a witness, and Mr. Joseph B. Tatem, who also signed it as a witness. All the testimony shows that no one except Mr. Davenport, the alleged testator, and Mr. Meeteer and Mr. Joseph B. Tatem were present when Mr. Davenport dealt with the paper in question.

The paper itself is not produced. The testimony shows that it has been destroyed after a cancellation by Mr. Davenport, the legality of which the complainant now disputes. Whatever evidence is offered touching the execution and contents of this

alleged testament is necessarily by parol proof. The testimony on the point of the making and publication of the paper, alleged by the bill of complaint to be Mr. Davenport's last will, and the showing of its contents, is of the essence of this case, for if it is not conclusively proven that such an instrument was duly made and published as the last will and testament of Mr. Davenport this court cannot by its decree declare and establish it as his will, no matter under what circumstances it may have been afterwards revoked and destroyed.

The examination of the two subscribing witnesses, Tatem and Meeteer, was in great part taken by leading and suggestive questions. Its details are too long to be here repeated, but a short summary will show how far they furnished the necessary proofs. No one else than these two could prove the performance of the statutory requirements necessary to the making of an effective will, for, as stated, it is admitted they were the only persons present with Mr. Davenport when those requirements must have been performed, if they ever were performed. Mr. Tatem testified that he took the alleged will over to Mr. Davenport's house; that Davenport signed it in the presence of both himself (Tatem) and Meeteer, and that they both signed it in Davenport's presence; but he makes no proof whatever that on the occasion described Mr. Davenport published or declared, directly or indirectly, that the paper which he and the witnesses signed was his will; nor does this witness prove that Davenport in any way characterized the paper as his will, nor that anyone else did, in Davenport's presence and with his assent. Mr. Tatem invariably declared that he could not recall what Mr. Davenport said about the paper. Mr. Tatem proved nothing as to any attestation clause to the paper which he witnessed; he declared he did not know what the attestation clause of a will was. His testimony does not prove that the alleged will had any such clause. He did not seem to be unfriendly to the complainant but to be unacquainted with business of this sort and not able to recall its details.

The only person other than Joseph B. Tatem who was present when the alleged will was executed by Mr. Davenport was Mr.

Meeteer, the lawyer, who prepared the alleged will. He testifies that he received his instructions for the drawing of the alleged will from Mr. Davenport himself; that he prepared the paper according to those instructions, and that in January, 1903 (about the 20th), he went to Davenport's house; that nobody but himself (Meeteer) and Tatem was present when the alleged will was executed.

Mr. Meeteer was called to the stand four different times by the complainant to prove the due execution of the alleged will by Mr. Davenport. He was aided by leading questions and by the refreshment of the form-book, which he said he used in preparing the paper for Mr. Davenport. His memory was tortured in the effort to aid him to recall the performance by Mr. Davenport of the statutory requirements. Mr. Meeteer, when on the stand, appeared to state frankly all the facts which he could recall.

On his first examination Mr. Meeteer testified that he thought he and Tatem were subscribing witnesses to the will; that he believed they were both present at the same time, and both saw Davenport sign the will, and that he thought Davenport saw both the witnesses subscribe their names. But he was not able to give any positive and unaided testimony. He swore that he could not be certain who were named in the will as executors; that he could not speak with certainty, and that it was only guess work. The only statement he made on this first examination which had enough certainty to convey a definite impression was his declaration that he left the alleged will in Mr. Davenport's possession and has not since seen it.

Mr. Meeteer entirely failed on his first examination (as Mr. Joseph Tatem before him had failed) to prove that any declaration was directly or indirectly made by Mr. Davenport that the paper which he signed was his will, or that anyone else in his (Davenport's) presence ever referred to that paper as his will. Nothing shows that Davenport in any way identified that paper as his will.

Having given this testimony, Mr. Meeteer was discharged as a witness by the complainant. He left the stand, but was after-

wards recalled by the complainant in an effort to show a declaration by Mr. Davenport that the disputed paper was his will.

On this second examination Mr. Meeteer testified that Mr. Davenport did not say anything at the time of the execution of the will, except that when he (Meeteer) handed the will to Davenport he said "he was satisfied." Mr. Meeteer said he could not recall exactly what was said when Mr. Davenport expressed his satisfaction, and that he (Meeteer) would not attempt to give the substance of Davenport's statement.

The complainant then tried to show by Mr. Meeteer that an efficient attestation clause, indicating performance of the statutory requirements, was annexed to the alleged will which Mr. Davenport signed, and that such a clause had been duly executed by the witnesses. Mr. Meeteer testified that he could not repeat from memory the attestation clause which he engrossed on the will. To questions put in varying form he several times replied that he could not repeat that attestation clause. He was then asked whether he prepared the attestation clause of the alleged will from a form-book, and he stated that he had used *Corbin's Forms.* A copy of that book was produced and the form of the attestation clause of a will was pointed out to Mr. Meeteer. He declared that he did not think the clause shown him was the one he used. The complainant then withdrew him from the witness-stand for the purpose of getting the book which he had used.

The testimony thus given by Mr. Meeteer on his above-stated second appearance does not show in any way that Mr. Davenport published and declared the paper in question to be his last will, or that any incident took place whereby Mr. Davenport either directly or indirectly characterized the paper in question as his will, or that an efficient attestation clause was annexed to it and signed by the witnesses. All that Mr. Davenport is proven to have said is that "he was satisfied." Nothing is shown to have been said to Mr. Davenport which identified the paper in the presence of the witnesses as his will, which was assented to by him as giving it that character.

Mr. Meeteer came to the stand, for the third time, with

*Corbin's Forms* in his hand, and pointed out a particular attestation clause, which he said was, as far as he could recollect, that which he had used. He was then asked this question:

"Can you, looking at the form you used, and thus refreshing your memory, state what were the words of the attestation clause in the first will?" His answer was, "I can't say; I won't say, positively, whether it was like this or not; it was similar to this form." He further said that he could not repeat the exact words of the attestation clause which he wrote on the disputed paper; that the substance of that clause, as he recollected it, was as follows: "Signed, sealed, published and declared in the presence of Thomas C. Davenport, who in his presence and in the presence of each other, we have subscribed our names as witnesses."

This attestation clause, which Mr. Meeteer testifies was in substance that which he wrote on the disputed paper which he and Tatem witnessed, does not declare that Mr. Davenport either published the document as his will or assented to and accepted its publication for him by anyone else. Such an attestation would be just as applicable to a deed or mortgage, a bond, or any other sealed instrument, as to a will. Nothing in it in any way defines the paper to be of a testamentary character. This clause, as reproduced by Mr. Meeteer, also fails to show that Mr. Davenport did anything, either of signing, sealing or publication. It only recites that these things were done in Davenport's presence, but does not say they were done *by him,* or that he in any way accepted them as his acts or declarations. It affirmatively declares that Davenport was passive, and that the witnesses were the actors, and it does not show that the witnesses signed the paper to attest that it was Davenport's will.

An attestation clause, to stand as proof of the performance of the statutory requirements, must affirmatively show that the testator signed the instrument or acknowledged the signature to be his and declared it to be his last will in the presence of the two witnesses, and that they in his presence signed their names thereto as witnesses. *Gen. Stat. tit. "Wills" p. 3760 § 22.*

At this stage of the cause there was an entire failure to prove

that Mr. Davenport had ever in any way declared the paper which Messrs. Tatem and Meeteer had witnessed to be his last will. Mr. Tatem had sworn that he could not remember what Mr. Davenport had said. Mr. Meeteer, after being·brought on the stand three separate times, had persistently declared that Mr. Davenport had said nothing except that "he was satisfied." Mr. Meeteer further testified that he could not recollect the exact words of the attestation clause which he appended to the alleged will, but that in substance it was as above stated.

Mr. Meeteer left the stand, his examination apparently finished. The next day he was brought on the stand for the fourth time by the complainant regarding the execution of the alleged will. Mr. Meeteer's testimony on this occasion varies so entirely from that which he gave on his three former examinations that I think that part relating to the execution of the alleged will should be here repeated. The words in which he gave it were as follows:

"*Q.* At the time the will was signed by Mr. Davenport and witnessed by you and Mr. Tatem, what, if anything, did Mr. Davenport say with respect to the will?

"*A.* He declared it—just at the writing—to be his last will and testament, and desired us to sign it as witnesses.

"*Q.* Can you give the attestation clause which was subscribed to this will, and which you drew?

"*A.* As I recall the fact, I got it from *Corbin's Forms.*

"*Q.* By referring to *Corbin's Forms* and refreshing your memory, can you give the attestation clause?

"Judge Pancoast—He is now going over exactly the same ground.

"The Vice-Chancellor—I supposed the matter was exhausted yesterday.

"Mr. Lloyd—This is a matter which the witness desires to correct.

"The Vice-Chancellor—Call his attention to it.

"*Q.* Yesterday, in your examination as to the attestation clause of the will, you testified to a certain part—do you desire to modify that?

"*A.* There was an error made in the attestation testimony which I will have to correct—one part of it.

"*Q.* What is it?

"*A.* Will the stenographer read my testimony given as to the attestation clause?

"[The stenographer read the testimony as found on pages 61 and 62. These pages included the attestation clause above quoted, which Mr. Meeteer declared was the substance of what he wrote in the alleged will.]

"*A.* Judge Armstrong.called my attention to something that was further on, I think——

"Judge Pancoast—Wait; we don't care about that.

"*Q.* You have heard the stenographer read the attestation clause, as recited by you yesterday; do you desire to correct that?

"*A.* I will correct both;. I will correct that one, and further on where I made a mistake.

"*Q.* Correct that attestation clause and give, to the best of your recollection, the attestation clause to the will signed by Mr. Davenport in your presence, some time in January, 1903; please give that attestation clause?

"*A.* As I recall it, it was in these words:

"*Q.* Referring to what, to aid you?

"*A.* *Corbin's Forms* [witness referred to *Corbin's Forms*, publication of 1882, Form No. 1656, entitled 'Attestation of will, another form'] : 'Signed, sealed, published and declared by the above-named Thomas C. Davenport to be his last will and testament, who, at his request, in his presence and in the presence of each other, we have subscribed our names as witnesses'—as far as I recall it, that was the clause.

"*Q.* In the preparation of this will, did you use any form-book?

"*A.* My recollection is, I used *Corbin's Forms.*

"*Q.* The same book to which you have just referred?

"*A.* Yes; your honor, there is another part there——

"The Vice-Chancellor—Wait until counsel asks you another question.

"*A.* I want to correct my testimony.

"*Q.* Is there any part of your testimony which you desire to correct?

"*A.* One portion; I think I was asked the question whether I could give the attestation clause to a will; I said, I think, that I could not; I didn't understand the question at the time; I would like that corrected; I want to say I can.

"*Q.* That is all?

"Cross-examination by Judge Pancoast.

"*Q.* Who called your attention to this error?

"*A.* Judge Armstrong called my attention, when I came off the stand. about this error I made.

"*Q.* What did the judge say?

"[Objected to.]

"The Vice-Chancellor—I think the cross-examination is clearly admissible, as it affects the amount of weight and credibility which is to be given to the witness' testimony. He was examined in full and in detail, and had gone off the stand; he is now recalled and re-examined upon the same subject, and changes his testimony materially. Such circumstances justify the opposing counsel in cross-examination to ascertain why the changes are made—what influences induced them. Question admitted.

"*A.* 'Don't you know the attestation clause of a will?' I told him. 'Yes, sir.'

"*Q.* What else did he say?

"*A.* He said on the stand I said I did not know it; I said that is a

misunderstanding; I did not mean to say it; I did not understand the question.

"*Q.* Did you say anything else to him?

"*A.* No, sir.

"*Q.* Then you communicated with the examining counsel, did you, the fact that you wanted to alter the testimony?

"*A.* I told him I was going to make a correction this morning, as far as that was concerned; that was wrong.

"*Q.* Where did Judge Armstrong see you and communicate with you on this subject?

"*A.* Over by the stove, there.

"*Q.* Now, without looking at this *Corbin's Forms*, can you state what the attestation clause is now, after your memory has been refreshed in this way?

"*A.* The attestation to the executed will, do you mean?

"*Q.* Yes.

"*A.* As far as I can recall it, it is as I read it; I will repeat it, if you want me to.

"*Q.* That is what I want you to do.

"Mr. Lloyd—I want to make an objection. The witness has already stated, both by his actions and language, that he can give that by referring to the form-book which he has used. He has referred to it to refresh his memory. Now, it seems to me, the question is whether he shall be called upon to repeat the language, which he, in terms, has stated he could not do without the book itself. That is hardly a fair question to the witness.

"The Vice-Chancellor—The subscribing witness to the will has himself declared that he can repeat its attestation clause. Cross-examining counsel certainly have a right to have him so do. Question admitted.

"*A.* 'Signed, sealed, published and declared by the said Thomas C. Davenport to be his last will and testament, who, at his request, in his presence and in the presence of each other, we have subscribed our names as witnesses.'

"*Q.* That is all."

The testimony of the witness Meeteer touching Mr. Davenport's execution of the alleged will is of the greatest importance. Upon it the whole case depends, as may readily be seen by a short *résumé* of the situation.

The alleged will is not produced in evidence. Neither draft nor copy of it has been shown. What it contained by way of an attestation clause rests wholly in parol proof.

In such a condition of affairs there were two modes by either of which it might be proven that Mr. Davenport made and published the instrument in question as his will. One method was by proof that the will had an attestation clause, which recited

the performance of all the statutory requirements, and that to such a clause were appended the signatures of the two witnesses. The other method was to produce witnesses personally in court, who by their testimony here given could prove that the several statutory requirements were in fact observed.

The complainant sought by both methods to make proof of the due execution by Mr. Davenport of the instrument in question.

Mr. Joseph B. Tatem and Mr. Meeteer, the subscribing witnesses to the alleged will, who appear to have been the only persons having any knowledge touching its execution and publication by Mr. Davenport, were both called and examined on both lines of proof.

Mr. Tatem, in testifying regarding any attestation clause annexed to the alleged will, declared that he did not know what an attestation clause was, and gave no testimony which in any way tended to prove that any such clause, perfect or imperfect, was annexed to the alleged will.

Mr. Tatem's testimony regarding Mr. Davenport's declarations touching the character of the paper which he and the witnesses signed was also of no value whatever, for he failed to prove that Mr. Davenport either declared that paper to be his will, or that by any act done or word spoken by him or in his presence and accepted by him, the paper was in any way characterized or recognized as his will.

Mr. Tatem having failed to prove the publication of the will, Mr. Meeteer is thus left the only witness by whom what Mr. Davenport actually said or did to identify the non-produced paper and declare it to be his will, can possibly be proven.

It must therefore be considered and determined whether Mr. Meeteer's testimony is alone sufficiently credible and weighty to support a decree that the paper in question was by Mr. Davenport declared to be his last will in the presence of the two witnesses.

There is no question of Mr. Meeteer's good faith nor of his intention to tell the truth regarding the events in dispute, as he recalled them. His manner, during all his several earlier appear-

ances, when he admitted that he could not, unaided, repeat the attestation clause of a will, indicated that he was then frankly stating his inability to recall the phrasing of such a clause.

After a suggestion from a bystander, Mr. Meeteer, on his fourth examination regarding the publication of the alleged will, in testifying to the attestation clause which he appended to that paper, still continues to prove that it was defective. He twice repeated it—once with the book in his hand, to refresh his memory, and again on cross-examination, without the book. The clause, as so twice stated by Mr. Meeteer, both times omits to declare that Mr. Davenport signed or published the alleged will *in the presence of the two witnesses.* Mr. Meeteer had previously given this attestation clause as he remembered it, making not only this omission, but also leaving out any declaration by Davenport that the paper was his will.

The result is that the only two witnesses who attempted to prove that Mr. Davenport declared the paper in question to be his last will, by showing that it had appended to it a perfect attestation clause, duly signed by the two witnesses, have entirely failed to prove that any such clause was appended to the alleged will.

The complainant has also attempted to prove, by Tatem and Meeteer, Mr. Davenport's declaration, in their presence, that the paper which he and they signed was his will. No one else could possibly prove this, for they only were present when the alleged will must have been recognized and identified by Davenport as his will, if it ever was so recognized. Tatem could not recall any such declaration by Davenport, and did not even recollect anything that he said on the subject. Mr. Meeteer, on his fourth and last examination, in answer to a question, "What, if anything, did Mr. Davenport say with respect to the will?" answered, "He declared it, just at the writing, to be his last will and testament, and desired us to sign it as witnesses."

This answer of Meeteer's, if accepted as credible proof, would show an efficient publication by Mr. Davenport of the paper executed on that occasion as his last will. But this answer is unsupported by any other testimony, parol or documentary, in

the whole case. The witness who makes it had on previous examinations been asked whether Mr. Davenport said anything at the time of the execution of the will and had replied, "I don't think he said anything;" and after much prompting finally said, "I think I handed the will to him, and he read it, and he said he was satisfied." He had testified that he could not recall exactly what was said when Davenport said "he was satisfied" and would not attempt to give the substance of it. After several times leaving the stand he at last returns, and without giving any reasons for having a better recollection of the incident, testifies with precision to an exact publication of the paper by the testator as his last will. This last testimony of Mr. Meeteer becomes valuable only because it contradicts what he had three times previously said on the same subject. It is presented in a manner to suggest grave doubts of its accuracy. To accept it as sufficient proof of the publication by Mr. Davenport in the presence of the two witnesses of the instrument claimed to be his last will and thus deprive his heirs of their inheritance, is in my view impossible for a court of justice.

It must therefore be declared that the complainant has failed to prove that the disputed instrument was made and published by Mr. Davenport as and for his last will in the manner required by the statute.

Neither the alleged will nor any copy thereof being produced, parol testimony regarding its disposition of Mr. Davenport's property is given by the complainant, Mrs. Alla A. Davenport, who states the testamentary gifts just as the bill of complaint claims they were made. The paper was shown to her shortly after it was signed. Mr. Meeteer also speaks on this point, but with the same indications of doubtful recollection which characterizes all his testimony. His identification of the properties disposed of is too uncertain to be of value. Mr. William H. Palmer also testifies to declarations of these testamentary dispositions received by him from Mr. Davenport a few days after the alleged will was executed. This testimony was objected to, but was received on the authority of *Rusling* v. *Rusling, 36 N. J. Eq. (9 Stew.) 603,* and *Sugden* v. *St. Leonards,*

*L. R. 1 Prob. Div. 154, 240,* where such declarations, though in the nature of hearsay, were admitted. Mr. Palmer's testimony shows that the dispositions, as stated by Mr. Davenport, were in substance those narrated by Mrs. Alla A. Davenport. These dispositions, as above noted, indicate that very much the larger part of Mr. Davenport's estate was by the disputed paper, given to Mrs. Alla A. Davenport.

The complainant's counsel, insisting that they have proven an efficient making and publication by Mr. Davenport of the instrument in question as his will, contend for the second position that Mr. Davenport was induced to revoke it by undue influence exerted over him by his son, Job P. Davenport, and that at the time Mr. Davenport did the immediate act of revocation and cancellation he was of unsound mind, legally incapable of performing such a function. In order to pass upon all the questions raised by the pleadings this contention will be considered.

The question of the exertion of either an undue or of any influence upon Mr. Davenport to induce him to revoke the disputed will, may be shortly disposed of by the statement that there is no proof which in any way indicates that his action in that regard was brought about by any stress or even suggestion. So far as any testimony touches on the subject, it tends to show that almost coincidentally with the signing of the disputed will Mr. Davenport, of his own mind, directed another to be drawn, and that during the two or three weeks that he survived the signing of the disputed will, he was of his own uninfluenced choice considering the making of a new one, which, so far as provision for the complainant is concerned, changed the disposition of his estate almost as radically as would his intestacy. It also appears that Mr. Davenport, during the several weeks of his life after the signing of the disputed will, in Job's absence, continually asked that it be brought to him, intimating dissatisfaction with its provisions. The final act of cancellation, as undisputedly proven, also shows that his destruction of that paper was his own uncontrolled act. Job was his only son and might properly have submitted his claims and those of his sisters to his father's consideration; he might lawfully have urged his

father to favor them in his will. Mere solicitation and importunity by a wife or children, do not constitute undue influence. Persons standing in such a relation to a testator have a right to ask consideration. To show undue influence there must appear some element of dominance over the will of the testator by which he is constrained to do that which, save for the force exerted over him, he would not have done. In the present case not even solicitation is proven. Nor is there a showing of any effort on Job's part to seclude Mr. Davenport from the visitation of Mrs. Alla A. Davenport and her friends for the purpose of having him under control, by which the burden of repelling an inference of the exercise of an undue influence, might be put on the defendants. The complainant made an effort to show some such condition but failed to prove it.

Neither the direct testimony nor any inference which may justly be drawn from it, shows that the destruction of the disputed will by Mr. Davenport was brought about by any undue influence exerted over him.

Admitting, for the purpose of considering the whole case, that there has been proof of the efficient making of a will, the facts which bear upon its revocation become of importance. To understand the influence which operated upon the mind of Mr. Davenport, inducing the destruction of the disputed will by which he gave the greater part of his estate to Mrs. Alla A. Davenport, it is necessary to ascertain what in truth were his relations to that lady and to Mrs. Anna Mary Davenport, from whom he claimed to have been divorced, and to his children, Job P. Davenport, Mary Anna Davenport and Lillian Davenport, the fruit of his marriage to Mrs. Anna Mary Davenport. It is only when the actual truth, as Mr. Davenport knew it, regarding his relations to all these people has been ascertained, that it can be determined what claim they had upon his consideration in the disposition of his estate, either by making a will or by his cancellation of any will and dying intestate, and how these claims affected his judgment and influenced his final action. An examination of the testimony on these points will throw light on Mr. Davenport's point of view.

22

It may be observed that the complainant, though alleging herself to be the widow of the decedent, Thomas C. Davenport, bases her claim in this suit to the consideration of the court, not upon her *status* as such widow, but upon her contention that she is a legatee and devisee under what she alleges is Mr. Davenport's last will, which she declares was never lawfully revoked.

It is, nevertheless, of importance that the relation of the complainant to Mr. Davenport should be ascertained, for though the complainant was living with Mr. Davenport as his wife, and he was holding her out to the world in that position, yet if he knew that in fact she was not his wife, and that their claim to be husband and wife was a mere pretence, it may explain his conduct when he came to remember those who might rightfully be entitled to his consideration in the making of his final disposition of his estate.

The complainant, just at the conclusion of the hearing, offered in evidence two exemplifications of decrees for divorce—one of Davenport from his wife, the defendant Anna Mary Davenport; the other of the complainant, under the name of Alice A. Fish, from her husband, George H. Fish. They were objected to by the defendants, but for the purpose of showing the real relation which existed between Mr. Davenport and Mrs. Alla A. Davenport, they were received.

A summary of the facts proven regarding these relations will show the influences and purposes which moved Mr. Davenport to revoke the alleged will, which the complainant seeks to establish.

Mr. T. C. Davenport was about fifty-seven years of age at the time of his death, on February 17th, 1903. He had been a produce merchant in Philadelphia for a number of years and had accumulated considerable property, real and personal. In the year 1865 he had married the defendant Anna Mary Davenport.

She bore to him several children, three of whom—Job P. Davenport, Mary Anna Davenport and Lillian Davenport—are now living, and are defendants in this cause. Mr. Davenport continued to live with his wife until about the year 1892.

In the year 1889 the complainant in this suit, who was then

the wife of George H. Fish, and known as Mrs. Alice A. Fish (and here spoken of as Alla A. Davenport), entered into Mr. Davenport's employment as stenographer and bookkeeper, and continued her association with him in that capacity up to the time of her alleged marriage to him, on March 16th, 1895, except for a few months.

In September, 1892, Mrs. Anna M. Davenport, the wife of Mr. Davenport, filed a libel in the Philadelphia court of common pleas No. 1 for a decree for divorce from bed and board, on the ground, among other reasons, of the adultery of Mr. Davenport with Mrs. Alice Fish, the complainant in this suit. The divorce proceeding was pending for some time, and resulted, in May, 1894, in a decree in favor of Mrs. Anna M. Davenport for a divorce *a mensa et thoro,* directing Mr. Davenport to pay her $10 per week for alimony. The payments of this alimony were continuously made by or for Mr. Davenport to Mrs. Anna M. Davenport, at her home in Philadelphia, once a month, from the time of the decree, in 1894, up to the time of Mr. Davenport's death, in 1903.

In 1893 Mrs. Fish went with Mr. Davenport and his daughter Lillian (a young girl of about seventeen years of age), to Yankton, in South Dakota. While he was there Mr. Davenport began a suit against his wife, Mrs. Anna M. Davenport, for absolute divorce. She had notice of this suit and appeared and defended it. Her son, Job P. Davenport, testified in both these suits as a witness for his mother and against his father. Mr. Davenport was refused the absolute divorce which he sought. The conduct of Mr. Davenport's son, Job, in supporting his mother in these two contests, irritated Mr. Davenport against Job, although it does not appear that in his maintenance of his mother's interests he did or said anything more than a son might justly be expected to do or say in behalf of his mother, under such circumstances.

In November, 1893, Mrs. Fish filed a petition for absolute divorce from her husband in the circuit court of Jackson county, Missouri, at Kansas City. The grounds stated were non-support, fear that he might kill her and conduct constituting him a

vagrant. The petition states, in express terms, that the petitioner had resided in Missouri for more than a year prior to the commencement of the action, and that the defendant, George H. Fish, resided in Philadelphia, Pennsylvania, and prayed for an absolute divorce and, pending the suit, for an allowance for support and attorney's fees, and a decree for alimony. Mrs. Fish, by her own oath annexed to the petition, verifies it, and expressly states that her husband resides in Philadelphia. An order was made for publication in a local newspaper of notice of the suit to the defendant, Mr. Fish, but no order for notice by mail or otherwise to the defendant husband, although the petitioner had sworn she knew that he resided in Philadelphia.

On January 11th, 1894, Mrs. Fish obtained an undefended decree of absolute divorce, which declares that the cause was "submitted to the court upon the petition and evidence of creditable witnesses." No testimony whatever accompanies the exemplification of the judgment, although the certificate of the clerk of the court declares the copy to be a "complete copy of the decree of divorce and all proceedings had in the cause." The attorneys who acted for Mrs. Fish were Scofield & Cheesman.

On November 30th, 1894, Mr. Davenport filed a petition in the same Kansas City court against his wife for an absolute divorce. The grounds stated are assaults, threats to poison, violent abuse and the defendant Mrs. Davenport absenting herself from the bed and board of the petitioner, without cause, for a year prior to the filing of the petition. The petitioner further states that he has resided in Missouri for one whole year and more before the filing of his petition for divorce. The affidavit of verification was made by the petitioner, Mr. Davenport, and states that Mrs. Davenport was non-resident in Missouri, without stating where she did reside. An order was made for publication in a local newspaper, but not for mailing or other personal notice to the defendant Mrs. Davenport.

On February 25th, 1895, Mr. Davenport obtained a decree of absolute divorce, with a recital precisely such as is made in the Fish decree, to the effect that the cause was "submitted to the court upon the petition and evidence of creditable witnesses."

The exemplification in this case also certifies that it is a "true and complete copy of the decree of divorce and all proceedings had in the cause," but no testimony accompanies the certificate.

The law regarding the recognition in this state of decrees for divorce made in other states, has been definitely declared by the court of errors and appeals in the case of *Felt* v. *Felt, 59 N. J. Eq. (14 Dick.) 610.* It is there stated as follows:

"Interstate comity requires that a decree of divorce pronounced by a court of the state in which the complainant is domiciled and which has jurisdiction of the subject-matter of the suit shall, *in the absence of fraud,* be given full force and effect within the jurisdiction of a sister state, notwithstanding the defendant does not reside within the jurisdiction of the court which pronounced the decree and has not been served with process therein; provided that *a substituted service has been made in accordance with the provisions of the statute of that state and that actual notice of the pendency of the suit has been given to the defendant and a reasonable opportunity afforded to put in a defence thereto;* and provided further, that the *ground upon which the decree rests is one which the public policy of the state in which it is sought to be enforced recognizes as a sufficient cause for divorce."*

The divorce suit begun by Mrs. Anna M. Davenport in Philadelphia common pleas court No. 1 in 1892 resulted in a verdict that the defendant, Thomas C. Davenport, had been guilty of adultery with Alice Fish (the complainant in the suit now under consideration) and a judgment of divorce *a mensa et thoro* and for alimony to Mrs. Davenport.

The record of complainant's suit for divorce from her husband, Mrs. Fish, in 1893, in the Kansas City court, shows that she knew that her husband lived in Philadelphia, and no proof whatever appears either by the record or otherwise that any actual notice of the pendency of that suit was ever given, or attempted to be given, to Mr. Fish, the defendant in that suit. He swears in the present case positively, without contradiction, that he never had any notice of any proceedings brought by his wife for divorce, and that he first heard that she had secured a

divorce from him (Fish) after the death of Mr. Davenport. Her divorce suit lacks the element of actual notice to her husband (Fish), which is stated in *Felt* v. *Felt, supra,* to be essential to the recognition of its decree by our courts.

The element of fraud in the complainant's application for divorce is also strongly indicated by several facts. The complainant knew that her husband, Mr. Fish, lived in Philadelphia. Her petition asked for alimony *pendente lite* and costs and counsel fees from her husband, yet she never gave him any actual notice of the suit, nor did she seek in any way to secure from him for herself either alimony or counsel fees, which, if done, would, of course, have given Mr. Fish immediate notice of the suit. She contented herself with a final decree for an absolute divorce from Mr. Fish, obtained, as she must have known, without any notice to him.

The testimony in the case now before me, when read in the light of the complainant's previous relations to Mr. Davenport, challenges the *bona fides* of her residence in the State of Missouri, where she obtained her divorce. On the libel filed in 1892 by Mrs. Anna M. Davenport in the Philadelphia court it was found that Davenport had committed adultery with the complainant. At that time she and Davenport lived in Philadelphia. Almost immediately both Davenport and Mrs. Fish applied for divorce from their respective spouses, not in Philadelphia where they resided, but under the easier laws of the western states. Davenport's first application, in 1893, was in South Dakota. He was defeated by the appearance and defence made by his wife. Mrs. Fish's application was made in November, 1893, in Missouri. The applications were substantially coincident. Mrs. Fish swore that she had resided in Missouri for a year previous to the commencement of her suit. She secured her decree for divorce on January 11th, 1894, as stated, without any notice to her husband. While these proceedings were going on, Davenport and Mrs. Fish resided for a time in the same boarding-house in both South Dakota and Missouri. When Davenport was defeated by his wife in his South Dakota suit, he filed another suit in November, 1894, in Missouri, in the

same court to which Mrs. Fish had applied, and employed the same lawyer. This time Davenport gave no notice of his suit to his wife. He got his decree on February 25th, 1895, without any defence. On March 16th, 1895, Davenport and the complainant were married in Kansas City, Missouri, and departed that state, for which they appear to have had no further use. Considering the testimony regarding the relations of the complainant to Mr. Davenport and the mode in which her suit for divorce from her husband, Mr. Fish, was conducted, I am constrained to believe that it was a fraudulent imposition upon the court whose decree was thus obtained.

Mr. Davenport's divorce from his wife is also open to the same criticisms made against that of Mrs. Fish, the complainant. Davenport knew when he applied for his Missouri divorce, in November, 1894, where his wife was living, because he was then paying her alimony at her residence in Philadelphia under her decree obtained against him on May 5th, 1894, in the Philadelphia court. He had just been defeated by his wife in his South Dakota suit for a divorce. It was obviously much more convenient to secure a divorce without notice to so troublesome a defendant as his wife had shown herself to be. He therefore gave her no notice, and because of this incident his Missouri divorce is also deficient in the essential element of actual notice required by the court of errors and appeals, decision *Felt v. Felt, ubi supra.*

Mr. Davenport's Missouri divorce also bristles with indications that it was a fraudulent proceeding. He stated as one of the grounds for that application for divorce, in November, 1894, that his wife had absented herself from his bed and board without cause for a year prior to the filing of his petition. He swore, in verifying his petition, that this was true. He then knew that since the preceding May (1894) his wife was justified in absenting herself from his bed and board by a decree of limited divorce with alimony, &c., which she had obtained against him in the Philadelphia court because of his adultery with the present complainant. In the Philadelphia case he had appeared by counsel and had defended the suit by severe cross-examination.

He had taken no appeal from that decree and had paid alimony thereon to his wife continuously thereafter.

The element of fraud is also shown by Mr. Davenport's suppression, in the Missouri suit, of the fact that he had just before applied in the South Dakota court for a divorce from his wife; that she had there appeared and defended the case on its merits, and had obtained a judgment in her favor. By suppressing this fact in his Missouri suit, and keeping his wife in ignorance of that suit, so that she could not set up this or any other defence, Mr. Davenport imposed upon the Missouri court.

Fraudulent representations to the Missouri court as to the *bona fides* of Davenport's residence in that state are also strongly indicated. Mr. Davenport had been defeated, in 1893, in South Dakota, by his wife on his application there made for a divorce. In November, 1894, he applied for a divorce in Missouri (without notice to his wife as above stated), representing and swearing that for a year previously he had been a resident of that state. He thus obtained an undefended decree in February, 1895, married Mrs. Fish, the complainant, in March, 1895, and at once and permanently left the State of Missouri.

That Mr. Davenport knew that his Missouri decree for divorce was a fraud is also shown by his own conduct after he had obtained that decree. He secured it in order to dissolve his previous marriage to Anna Mary Davenport and to enable him to marry Mrs. Fish. If that decree was effectual, it did dissolve his previous marriage and freed him from any other obligation to support his wife. This was plain to the lowest comprehension. Notwithstanding this, after Mr. Davenport had obtained the Missouri absolute divorce as above stated and had married Mrs. Fish (the complainant in this suit), he continued to pay alimony to his wife, Mrs. Anna Mary Davenport, as required by the Philadelphia court, up to the time of his death.

Mr. Davenport had been found guilty of adultery with Mrs. Fish. They are shown to have been in constant and intimate association before and during the period that their suits were being prosecuted for the obvious purpose of securing divorces from their spouses and marrying each other. It is almost a

compulsory inference that each knew of the other's actions and conduct, and of the pretentious character of their proceedings.

Considering the whole testimony regarding these mixed marriage relationships, it is fairly shown that the Missouri divorces of both Mrs. Fish, the complainant, and Mr. Davenport, were obtained without the actual notice to the defendants in those suits which is required by the decisions of this state; that both these judgments are tainted by the fraudulent acts and statements of the parties who procured them; that Mrs. Fish, the complainant, and Mr. Davenport, were each cognizant of the fraudulent character of those suits, and that the decrees for divorce therein pronounced should not be deemed to be lawful dissolutions of the previous marriage bonds of the parties who perpetrated the frauds by which they were secured.

When Mr. Davenport, in March, 1895, went through the ceremony of a marriage with the complainant, Mrs. Fish, he knew, and she knew, that they had by fraud obtained pretended divorces from their previous spouses. Their whole subsequent life together was lived under this consciousness.

When Mr. Davenport, in 1903, came to dispose of his estate, in contemplation of his impending death, he acted with the knowledge that Mrs. Alla A. Davenport's marital relations with him were a mere pretence and a fraud, and that the persons rightfully entitled to his consideration in his final disposition of his estate were his real wife, Mrs. Anna Mary Davenport, and his children, Job P. Davenport, Mary Anna Davenport and Lillian Davenport.

In the latter part of 1902 Mr. Davenport became ill with an ailment the symptoms of which were somewhat obscure. He came, with Mrs. Alla A. Davenport, to Collingswood, in Camden county, to board. He there had several medical advisers, all of whom were called as witnesses in this cause. Mr. Davenport, in the late fall of the year 1902, was able to be about the house, but made no progress toward the recovery of his health, and in the latter part of December, 1902, and in January, 1903, was confined to his room, though at times able to leave his bed.

Regarding his mental condition up to the date of January

20th, 1903, neither side in this cause raises any question. Mr. Davenport was then boarding in Collingswood. His children, because of his matrimonial complexities, were separated from him. Mrs. Alla A. Davenport, the complainant, was his sole resident associate. Doctors occasionally visited him, friends sometimes called, and during the latter part of the time nurses were engaged for him, but Mrs. Alla A. Davenport was his only constant companion.

It was under these circumstances that the instrument which the complainant claims is his last will was signed by Mr. Davenport, as above narrated, in the presence of Mr. Joseph B. Tatem and Mr. Meeteer.

The complainant's contention is that up to and at the time of the signing of the disputed will in her favor Mr. Davenport was of sound and disposing mind, and that almost immediately after it was executed he became afflicted with an insane delusion that she was slowly poisoning him by administering doses of some solution of arsenic; that acting under this false belief he revoked and canceled the will which favored her and chose to die intestate, so that the gifts to her might be defeated and his estate go to his children by his intestacy.

The will sought to be established was signed about January 20th, 1903, the day not being exactly settled by the evidence. When the alleged will was signed Mr. Davenport was quite ill at the rooms in Collingswood, which he and the complainant, Mrs. Alla A. Davenport, then occupied. Dr. Thornton, of Philadelphia, was then and for some time previously had been his medical adviser. Mrs. Alla A. Davenport, up to that time, had been his sole constant attendant and nurse.

The evidence regarding the mental condition of Mr. Davenport applied itself to two distinct periods of time. The first period is from January 28th, 1903, to February 6th, 1903. During this period Mr. Davenport was sick at his Collingswood rooms. On February 6th he was taken to the Homœopathic hospital in Camden.

The second period ran from February 6th to February 16th, when he destroyed the will. All the incidents of this last

period happened at the hospital, where Mr. Davenport died on February 17th, 1903, the day after he had revoked his will.

The complainant produced as witnesses several medical gentlemen who were not in attendance upon Mr. Davenport, indeed, who never saw him. They were examined upon hypothetical questions propounded by complainant's counsel regarding Mr. Davenport's sanity on February 16th, 1903, when he revoked the alleged will. They testified that under the circumstances stated to them they were of opinion that Mr. Davenport was then insane. The testimony of these gentlemen is of very little value, not because of any lack of either skill or experience on their part, but for the reason that in asking their opinions many incidents were stated to them as permanent conditions which were in fact temporary and passing happenings, and other most important and uncontradicted incidents, which would undoubtedly have affected their judgment, were not stated to them at all. Under these circumstances I have not deemed it to be necessary to restate in detail the opinions given by these professional gentlemen and will proceed to a summary of the testimony of those witnesses called on the part of the complainant who narrate the incidents of Mr. Davenport's conduct and conversation which came under their personal observation.

It appears that on January 28th, 1903, several days after the will was signed, Mr. Davenport had a very alarming sinking spell. The nurse, Miss Tribbits, and Mrs. Alla A. Davenport testified that from that time he developed symptoms of insanity, refusing to take medicine and food unless some one previously tasted it, believing he would be poisoned, thinking that people were persecuting him, and talking irrationally.

Nurse Tribbits testified regarding these manifestations as if they indicated a condition of permanent insanity, and the complainant's testimony is expressed to the same effect.

A witness named Palmer, a remote connection of Mrs. Alla A. Davenport, testifying for her, stated that he called on Mr. Davenport twice during the last week of his stay at Collingswood. The dates he cannot give exactly, but they were about the 1st and the 4th or 5th of February.

Mr. Palmer testifies that during the first visit Davenport spoke in a very wild manner; that he said there was a gang of poisoners around the house—a lot of young men who wanted to kill him; that he was wearied to death over his property; that Harry Tatem wanted him to take his property from Alla and give it to Job and the other children; and that they had had more than they deserved; and finally said to Palmer, "If I am poisoned, I want you to see that Alla has what I have given her," &c.

Regarding Mr. Palmer's last visit to Mr. Davenport at Collingswood, about February 5th, Mr. Palmer testifies that Mr. Davenport was at this time greatly weakened; that he muttered sentences, some of which were connected and some incoherent; that he would sink at times into a semi-comatose condition and would again rouse up; that he said, "I believe I would be safer from the poisoners at the hospital than I would at home," and "look at my hands," holding them up, "see the poison dripping from them; I have been loaded with poison; that gang of fellows around Collingswood are determined to poison me and get my property away from me."

It will be noticed that Mr. Palmer's testimony regarding the wild talk of Mr. Davenport, if it be true, tends to defeat rather than support the complainant's argument that Mr. Davenport revoked—while acting under a delusion that Mrs. Alla A. Davenport was endeavoring to poison him—the will which he had signed in her favor.

Mr. Palmer says it was not Mrs. Alla A. Davenport who Davenport deludedly feared would poison him but "the gang of fellows around Collingswood," who were, in Davenport's belief, unfriendly to Alla. This frame of mind would have led Davenport not to revoke but to maintain his supposed will as it had then (February 1st to 5th, 1903) been expressed. He asked Palmer to see that his provision for Alla was carried into effect.

Mr. Palmer's testimony regarding these two casual visits was also phrased to give the impression that the indications of

mental disturbance given out by Mr. Davenport were evidences of his permanent derangement.

Dr. Thornton, of Philadelphia, had been consulted by Mr. Davenport for some time before January 28th, and was at that time his consulting physician and saw him occasionally. He testifies that on January 28th he considered Mr. Davenport to be mentally unbalanced, and on February 1st, still worse, that he was entirely unbalanced. Dr. Thornton says he came to this conclusion because it had been told him that some of Davenport's family had shown insanity, and from what the nurse (Miss Tribbits) told him of Davenport's restlessness, of his suspicions of his wife, and his refusal to take medicine, &c., his wild look, and that Davenport's conversation was that of an unbalanced mind. Dr. Thornton admits that he knew nothing of Mr. Davenport's case (except by hearsay) after February 1st. He diagnosed his disease to be progressive pernicious anæmia (which he says was confirmed by the autopsy) and was apparently of opinion that the condition of "unbalance" which he saw in Mr. Davenport on February 1st was a permanent one.

It seems to be impossible to accept this conclusion of the complainant, of Miss Tribbits, Mr. Palmer and Dr. Thornton. Miss Tribbits, on cross-examination, admitted that when Dr. Massinger and Dr. Thornton were with Mr. Davenport he always talked intelligently to them, and it clearly appeared that the symptoms of mental aberration shown during the earlier part of her attendance were occasional, and not continuous. Mr. Palmer was but a casual visitor at the times when he saw Mr. Davenport, and knew nothing of his condition at other times.

Many other witnesses, who had the best opportunities to observe Mr. Davenport at Collingswood during this period from January 28th to February 6th, when he went to the hospital, give a very different account of his condition at that time.

Dr. Massinger, the local physician who attended Mr. Davenport two or three times a day from Monday, January 26th, to Sunday, February 1st, who had much better opportunity to see and know his mental condition than Dr. Thornton had, testifies

that Mr. Davenport was perfectly rational and clear on all points.

Mr. Oschman, the man nurse, who succeeded Miss Tribbits, came on February 2d and stayed until February 6th, and was present during one of Palmer's calls, testified that Davenport's conversation was rational, and that he was neither delirious nor "flighty" during his attendance as nurse.

Mr. Fowler, the barber, who had several times shaved Mr. Davenport, was sent for on February 5th, the day before he went to the hospital. Mr. Davenport greeted him when he went in the room and passed an appropriate word or two about his own health. Mr. Fowler testifies that Davenport was rational, as he always had been.

Mr. J. H. Hutchinson, a remote connection of Mr. Davenport, stayed with him on February 2d. The complainant claims that the violent hostility of Mr. Davenport to his nurse (Miss Tribbits), and his other manifestations which group themselves around this day, were indications of his permanent insanity. Mr. Hutchinson was invited to stay because the family were alarmed and wanted some man in the house. He went there about nine o'clock in the morning and stayed until nine o'clock in the evening, most of the time being in a room adjoining Mr. Davenport. Mr. Davenport had some conversation with Mr. Hutchinson, which was entirely rational. Mr. Hutchinson testifies that he neither heard nor saw any violence on Davenport's part.

John F. Foster was called in for one night in order to give a rest to the nurse (Oschman). Foster came to Mr. Davenport's rooms at Collingswood on February 3d, about eight o'clock in the evening. He narrates an incident of the sick chamber which, though trifling in itself, is certainly an indication that Mr. Davenport was not a lunatic. A dispute arose between Mr. Davenport and Mrs. Alla A. Davenport regarding Davenport's ability to wait on himself. Mr. Davenport persistently declared that he did not want any help and refused to accept it, and finally had his way about it.

Joseph Tatem was a frequent visitor of Mr. Davenport. He saw him at his Collingswood rooms on February 1st, the night

before Dr. Sheldon was called in. His testimony shows that on that occasion Mr. Davenport conversed rationally regarding his purpose to change his doctor, gave a reasonable cause for change, selected Dr. Sheldon as his new doctor, stating the occasion of his confidence in him. Mr. Davenport plainly, then, comprehended the existing situation, had a clear perception and recollection of previous incidents and their relation to present conditions and possible future happenings, and formed his own independent judgment thereon. In short, he dominated the situation, giving positive evidence of a sane and disposing mind and memory..

Henry R. Tatem, postmaster at Collingswood, a long-time friend of Mr. Davenport, saw him during this period almost every day, and sometimes oftener. The testimony of all the witnesses shows that Mr. Tatem was, at Mr. Davenport's request, a frequent visitor at his rooms. At this time Mr. Henry R. Tatem was both a social and business friend, and had the best opportunity of any witness not constantly with Mr. Davenport to know his mental condition. Mr. Tatem unhesitatingly testifies that Mr. Davenport, while at his rooms (Mrs. Williams' house.) in Collingswood, always talked rationally, answered questions pertinently, renewing and continuing conversations from the place where in their previous talks they had been dropped. Mr. Tatem states the subjects of the conversations between them, and they appear to be such as would naturally and reasonably have come under discussion between men so related. Such conversations could not have been carried on by an insane person. Mr. Henry R. Tatem was most severely cross-examined. The complainant's counsel, rightly judging that his testimony was forcefully antagonistic to the complainant's contentions, every effort was made to discredit him. Mr. Tatem's conduct while on the witness-stand indicated that he was frankly telling, as nearly as he could remember, the various incidents to which his attention was called. He appears to have striven to be a faithful friend to Mr. Davenport. Nothing was shown which ought to lessen his credibility or the weight of his testimony.

Dr. Sheldon succeeded Dr. Massinger as Mr. Davenport's

attending physician on February 2d. He had some previous acquaintance with the Davenports and was called in by Mr. Davenport's special direction. Dr. Sheldon visited Davenport on February 2d, conversed with him about his illness, his consideration of a change of physicians and his chances of recovery. Dr. Sheldon continued to visit Mr. Davenport at his Collingswood rooms. The doctor testifies that Mr. Davenport's mind was clear and his conversation coherent and in every way normal; that on one occasion he was a little off in his head, but that it was a temporary and not a permanent condition.

Dr. Sheldon's narrative of the dispute regarding Mr. Davenport's removal to the hospital, on February 6th, clearly shows that Davenport was then deemed by all who talked with him to be in his right mind; that he was appealed to, *pro* and *con*, by those who differed on the question, and that he considered and determined the matter for himself. Regarding this incident the testimony shows that Davenport himself originated the idea of his removal from his rooms at Collingswood to the hospital. Mrs. Alla A. Davenport constantly opposed it. Mr. Davenport asked the advice of his friend, Mr. Henry Tatem, who told him he thought he would have proper care and attention at the hospital, and Davenport, after some wavering, decided to go.

It is not without significance that Mrs. Alla A. Davenport herself, when speaking or acting in Mr. Davenport's presence, or in carrying messages for him while he was sick at Collingswood, always dealt with or for him as if he were in his right mind and entitled to consideration as a sane man. She argued with him, and remonstrated with him, appealing to his consideration and judgment in various ways during the period (from January 28th to February 6th) now under examination.

This was particularly shown by the complainant's conduct on February 6th, when it was under debate whether Davenport should go to the hospital. She did her best to persuade Mr. Davenport not to go. She tells a weird story of a dreadful oath, vouching for her conjugal faithfulness, which, she says, he then made her take (just before he went to the hospital) after telling her that he had heard she was untrue to him. Neither in this

nor in any of the incidents of their life at the Collingswood rooms did Mrs. Alla A. Davenport deal with Davenport as if he were of unsound mind. If any such oath was forced from her by Davenport, it may well be believed that the doubts of her fidelity which filled his mind, were sustained, if not provoked, by his memory of the manner in which they first came together. This is evidence not of insanity but of the ordinary operation of a sane mind.

The testimony offered by the defendants regarding Mr. Davenport's mental condition at Collingswood between January 28th and February 6th, when he went to the hospital, is given by disinterested witnesses. They were in frequent association with Mr. Davenport. They present phases of his daily life from many different points of view. They coincide in showing that Mr. Davenport (though seriously ill) was then in his right mind, able to comprehend correctly the incidents happening around him, to hear and decide important questions with intelligent judgment and to impose his decisions upon those who should carry them into effect. These are not the characteristics of one who is afflicted with insanity or whose mind is deranged by insane delusions. Nobody at that time dealt with him in any way as the victim of either insane delusions or general insanity. The abnormal symptoms which he manifested were accepted as temporary mental disturbances attendant upon the more intense attack of his physical disease and leaving him at other times entirely capable of transacting business and directing his affairs.

The testimony regarding Mr. Davenport's mental condition preceding February 6th, when he went to the hospital, is quite insufficient to show that he was suffering from a permanent condition of either insanity or delusion.

Mr. Davenport went to the Camden Homœopathic hospital on February 6th, and from this date until the 16th day of February, when he revoked the alleged will, is the period of his mental history yet to be examined.

After Mr. Davenport went to the hospital, on February 6th, he showed some temporary improvement in health, but did not

at any time make any continuous or important steps towards
recovery. While at the hospital Mrs. Alla A. Davenport visited
him almost every day. Mr. Palmer saw him there twice.

Dr. Sheldon continued to be his attending physician at the
hospital and saw him every day. He was nursed there by two
nurses, Miss Randolph and Miss Croyle, one or the other of
whom was almost constantly with him, and he was visited there
quite frequently by Mr. Harry Tatem, Mr. Joseph Tatem and by
his son, Job Davenport, one of the defendants.

The testimony of Mrs. Alla A. Davenport, the complainant,
and of Mr. Palmer regarding Mr. Davenport's mental condition
while at the hospital is given for the purpose of showing that
during his stay there Mr. Davenport was continuously insane,
possessed by delusions, unable to understand or appreciate facts
plainly within the perception of all sane persons, and that he
was, therefore, on the 16th day of February, incapable of in-
telligently revoking his will.

Mrs. Alla A. Davenport declares that she found him at the
hospital to be always capriciously changeful, sometimes repelling
her rudely and at times receiving her kindly; that he talked
about poisoners, and, looking at his hands, referred to poison
on them; that he said the hospital people were freezing him to
death and did not treat him right. She declares that on the
night before February 16th she visited him and found him to be
unconscious, and that on the morning of the 16th she saw him
for half an hour, when he was not recognizing anyone. She
also says she could not have any conversation with him; that
he was very stupid and almost did not notice her at all.

Mr. Palmer, on his first visit to Mr. Davenport at the hos-
pital, on the 10th or 12th day of February, testifies that Da-
venport declared that the hospital people did not treat him
right; that they were trying to freeze him to death, and that he
again referred to the gang of poisoners haunting the Collings-
wood house and to poison on his hands; that Davenport said
that Harry and Joseph Tatem were trying to get him to make
a new will and give all his property to Job; that they were at
the hospital every day and were killing him, &c.; that they

would not let Alla be alone with him a minute. Mr. Palmer says no one else was present with him and Davenport at this time, but on cross-examination admitted that the nurse came in and out once or twice.

Mr. Palmer called again on the 14th of February and testifies that Mr. Davenport's mental condition was then worse; that he still referred to the poisoners, and to Harry and Joseph Tatem killing him and demanding that he should give his property away; that the hospital people did not treat him right, &c. Mr. Palmer declares that in his opinion Mr. Davenport was insane every time he saw him from the 1st day of February, 1903.

The testimony offered on the part of the complainant regarding Mr. Davenport's condition after February 6th, while at the hospital, is intended to show that he was permanently insane, and that all his acts were continually under the control of insane delusions. The witnesses who attempt to prove this saw Mr. Davenport occasionally during short periods, and formed their opinions that Mr. Davenport was insane on February 16th, when he revoked his will, from limited opportunities of observation, the complainant's own testimony being plainly colored by her interest in the cause.

On the other hand, the defendants have produced many disinterested witnesses who had as good or better opportunities to know the truth of Mr. Davenport's mental condition while he was at the hospital, who all agree that his outgivings indicated that his mind was sound and capable. A short summary of the testimony will show the reasons for their conclusions that Mr. Davenport was not insane.

Mr. Joseph Tatem called on Mr. Davenport at the hospital on the next Tuesday or Wednesday after he had gone there. Mr. Tatem says it was probably Wednesday, which was the 11th day of February. He stayed half an hour. Mr. Tatem testifies that Mr. Davenport was inclined to talk, and the nurse said she didn't think it would hurt him if he didn't talk too much. He talked about some wood which Harry Tatem was selling for him, spoke of himself cheerfully as being better, referred to his hope that he might go and live with his son, Job, as soon as he

was able to go out, and expressed his satisfaction at the prospect, although he never expected to be entirely well. He said, "Alla [referring to the complainant] will make an awful fuss;  *  *  * I dread the time;" and he said, "I have been informed that Fish will sue me for alienating the affections of his wife." Fish was Alla's husband. He asked Tatem whether he thought he was in any danger. Tatem told him that as ten years had gone by he didn't think he need worry, and Davenport said, "Well, I can risk it."

Mr. Joseph Tatem declares that Davenport's conversation was always rational and coherent—"just as he always was."

Mr. Henry Tatem visited Mr. Davenport at the hospital on the afternoon of February 6th, the day he went there. Mr. Tatem had participated in the discussion had in the morning of that day relative to Mr. Davenport's going to the hospital. In the afternoon, when Tatem visited him, Davenport was sitting up in bed. Davenport narrated to Tatem the incidents of his trip to the hospital, and said he was glad to be there; arranged that a newspaper should be served to him at the hospital, and that a barber should be sent to shave him. He renewed previous conversations regarding a proposed sale of wood, which had been under discussion between Tatem and himself for some months. He told Mr. Tatem (with whom the will which the complainant seeks to establish had been deposited) that "he wanted him [Tatem] to bring that will in; he wanted to destroy it."

It should be noticed that this declaration by Mr. Davenport of his purpose to revoke that will was made on February 6th, ten days before he destroyed it.

Davenport told Tatem, during one of his visits to the hospital, that he (Davenport) "had made a mistake in his life and had done wrong, and that he wanted to make what reparation he could." He spoke of his intention, when he had somewhat recovered, to remove to the home of his son, Job, in Philadelphia. In talking with Henry Tatem at the hospital Mr. Davenport several times insisted that Tatem should bring in the alleged will so that he (Davenport) might destroy it. Davenport accompanied this direction to Tatem, which was given four

or five days before Davenport's death, with the remark that he would let the courts decide.  Mr. Davenport had previously given instructions for the drawing of a new will.  The draft of this proposed will has been produced in evidence here.  This will never was executed.  Mr. Davenport told Tatem he would not sign the newly-drawn will, but he expressed himself to be very anxious to have the first one (that now sought to be established) destroyed.

Mr. Henry Tatem was named as executor in the alleged will which Mr. Davenport had signed.  Tatem's material interests would naturally prompt him to maintain that will, in order that he might get commissions for executing it.  An intestacy will prevent him from getting any commissions.  He testifies that in fact he did all he could against the destruction of that will, and there is no proof that he did or said anything to induce its destruction.  As above stated, his testimony, though fiercely attacked, has not been refuted.

Mr. Henry Tatem testifies that Davenport's conversations with him were rational, and connected with matters of business which had previously been discussed between them.

At the hospital, where Davenport was attended by the two nurses—Miss Randolph and Miss Croyle—one or the other of these young women was constantly in attendance upon him, except an hour a day taken by the nurses for recreation and the period when they were absent at their meals.  These young ladies were both called as witnesses.

Miss Randolph testifies that she was Mr. Davenport's day nurse from the second day after he came to the hospital up to the time of his death.  She was present, coming in and going out of Mr. Davenport's room about every five minutes, during Mr. Palmer's visits to Mr. Davenport.  She testifies that she did not hear, to any extent, the conversations that went on between Davenport and Palmer, but she says that during those visits Davenport often asked her for a drink and for ice; that he was quite bright; that at no time did she notice that he was irrational in his speech, nor did she ever see him put out his hands and speak of poison dropping from his fingers; that her atten-

tion was not invited to Mr. Davenport by Mr. Palmer by reason of anything that Mr. Davenport said or did. She says that Mr. Davenport's condition was such that he could be left alone while she went to her meals; that he was so left alone three times a day while she was absent at her meals; that she never heard of Mr. Davenport's fears that he was being poisoned until after his death. She testifies that Mr. Davenport was mentally quite bright and rational, with the exception that he was a little. flighty once or twice, simply wandering in his mind.

Written memoranda were kept by the nurses on which were entered the patient's manifestations during her attendance. These were shown Miss Randolph, and she was sharply cross-examined as to entries there made by her, indicating that Mr. Davenport's mind was at times wandering, that it was not clear, &c. The witness testified that these truly stated Mr. Davenport's mental condition at the particular periods referred to in the memoranda, but that notwithstanding these exceptional instances his general mental condition was rational and clear.

Miss Croyle, the nurse who had charge of Mr. Davenport at the hospital from seven o'clock in the evening until half-past six in the morning, and waited upon him, and administered his medicines, and furnished him with everything which he might want, testifies that Mr. Davenport's condition was such that she went at times to other parts of the building without leaving anyone in charge of him, staying away as much as fifteen minutes, visiting other patients and getting her lunch. She further testifies that, although Mr. Davenport was physically weak when he arrived at the hospital, that his mental condition was rational; that subsequently to his arrival and down to the time of his death while she was in charge of him, his mind was clear, though at times he had periods of flightiness; that they lasted but a few minutes and were only temporary; that he was never violent; never gave any evidence of hallucinations; never spoke of poison dripping from his hands, or that a gang of poisoners were after him and trying to kill him, or like words. She unhesitatingly declares that, except for the occasional temporary wanderings of mind referred to, Mr. Davenport's mental condition was

rational during the whole period of her attendance upon him. She states that he summoned her by ringing a bell conveniently placed; stated his requests when she appeared, which were in themselves both reasonable and rational, and while he was not given to conversation his remarks were pertinent to the subject of which he was speaking and entirely clear and coherent.

This witness, also, was severely cross-examined by complainant's counsel with relation to the memoranda which she made, noting her patient's condition from time to time, which indicated (more particularly in the night) occasional wanderings of mind.

The complainant's endeavor is to show that the nurse's notes of Mr. Davenport's sickness while at the hospital indicate a condition of permanent mental derangement or of insane delusion, and that they were mistaken in their testimony when they say that these manifestations were casual and occasional only, not affecting his mental power.

The nurses' memoranda were offered in evidence by the defendants. They were not objected to by complainant and were therefore received. These notes have not in themselves any probative force to establish the truth of the matters therein narrated. A nurse cannot by telling someone that her patient is insane make her parol statement evidence in a suit in which she is not a party to prove his insanity. No more can she write down her observations of a symptom and her opinion thereon and thus make her memorandum evidence of the truth of the thing so indited.

Nurses employed in a hospital to attend upon the sick are in the process of receiving their training to undertake the care of patients. They have no completed medical education and oftentimes but a few weeks' or months' experience. To elevate their statements or records of their voluntary observations of the symptoms of their patients, made out of court, without the sanction of an oath, into positive evidence of the truth of their conclusions, would be dangerous in the extreme. Such writing made by a nurse may be used to refresh her memory when she is testifying, or upon cross-examination when seeking to show

that she made a note at the time of the event, which varies from her statement on the stand as a witness and thereby lessens the value of her testimony, but they cannot be received to establish the truth of the things narrated.

It was from this point of view that the use of the nurses' notes was permitted on this hearing. The references in those to Mr. Davenport's mental condition while at the hospital specify that at certain periods he was flighty or wandering in his mind, or mumbling in his sleep, or giving out other manifestations which commonly attend upon serious illness. The nurses who made the notes, when their attention was called to them, invariably testify that the abnormal manifestations narrated in their notes represented temporary and passing incidents and that Mr. Davenport's mental condition, while in their charge, was intelligent and rational. Their testimony clearly shows that though Mr. Davenport, while in their charge, was not talkative or given to much conversation, yet he so spoke and conducted himself that they at the time had no sense that he was either insane or influenced by any insane delusions. They were in constant attendance on him, and it is very difficult to believe that such extraordinary and noticeable conditions could exist in their patient and yet be hidden from their observation.

Dr. Sheldon, who went with Mr. Davenport to the hospital and attended him there, testifies that he remained with Mr. Davenport about three-quarters of an hour on February 6th, the day he was taken there; that Davenport discussed with the doctor the location of his room in the hospital and its outlook, and gave no indications that he was not entirely rational; that the day after he was removed to the hospital he wanted a newspaper and instructed the doctor to get him the "Ledger;" that he was provided with a newspaper and frequently read it, propped up in bed; that he called upon the doctor to arrange little matters of his personal comfort, and upon discovering that there was but forty cents in his pocketbook, remarked with a sort of grim humor "that it was pretty hard lines for a man to have only forty cents in a place like that." Dr. Sheldon also testified that almost every morning Davenport would refer to the fact

that Henry Tatem had not yet brought to him (Davenport) the will which he had executed in January. He told the doctor that he wanted to destroy that will; that Harry Tatem was procrastinating all the time so that he was unable to destroy it. (This is the will which the complainant seeks to establish in this suit.)

Mr. Davenport told the doctor "that he [Davenport] had made a mistake; that he had done his children an injustice, and he desired now to do them justice, which he believed it was his place to do—leave them his property."

Dr. Sheldon testifies that Davenport referred to his children and spoke intelligently about their circumstances, and of his intended removal to Job's house, as soon as the doctor could see his way clear to move him; that Davenport, in addition to reading the newspapers, frequently discussed with him (the doctor) the news of the day.

Dr. Sheldon was Mr. Davenport's attending physician during the whole period that he was at the hospital, visiting him twice every day, and therefore had the best opportunities to observe his symptoms. He testifies that Mr. Davenport's mental condition was entirely rational, and when examined in detail as to whether Mr. Davenport ever gave out in his presence any of the alleged manifestations of mental delusion, regarding poisoning, or conspiracies to kill him, or freezing him to death, or any other indication that he was possessed by delusions or hallucinations which led him to believe that things existed which in fact never did exist, Dr. Sheldon unhesitatingly testified that he never observed or heard from Mr. Davenport any such manifestations.

The testimony of the friends who visited Mr. Davenport at the hospital, or the nurses who cared for him, and of the doctor who attended him—all of the persons who had the best opportunities to observe him during the period of his stay at the hospital—all coincide in their statements that his conversation and conduct during that period (except at passing intervals, when he was occasionally what the nurses call "flighty") were intelligent and rational, and free from any indication of either delusion or insanity.

The incidents narrated by these witnesses of the statements and conduct of Mr. Davenport during this period at the hospital are themselves indicative that he was possessed of a sane and intelligent mind. He decided, in the face of Mrs. Alla A. Davenport's opposition, that he would go to the hospital; he discussed intelligently the location of his room there; he directed the preparations for his comfort; he believed that he would recover, as is shown by his plan to have himself removed to the home of his son, Job, when the doctor thought he was able; he appreciated the conditions and circumstances and relations of his life (this is shown by his conversations with Joseph and Henry Tatem and with Dr. Sheldon) ; he contemplated the possibility that Mr. Fish might sue him for alienating the affections of his wife (the complainant in this suit), and when reminded that ten years had gone by since his association with Fish's wife he declared he could run the risk; he kept in mind previous pending business transactions which he had had with Henry Tatem regarding the sale of his wood; he frequently insisted that the will which the complainant is now seeking to establish should be brought to him in order that he might destroy it. This purpose he declared and continually adhered to for at least a week before his death, remonstrating with Mr. Henry Tatem, who had the will in his charge, that he did not bring it to him in order that he might destroy it. During the same period he gave his reasons for his intended destruction of his will, declaring that he had made a mistake in his life, that he had done his children an injustice, and that he believed that it was his place to do them justice by leaving them his property. These declarations on the part of Mr. Davenport seem to me to be entirely consistent, intelligent and rational expressions, which indicate not delusion and hallucination, but true and sane comprehension of his situation in life, of his relations to his property and to his family and of their rightful claims upon his consideration, and of his previous testamentary disposition of his property. Such conduct and expressions indicate, in the highest degree, that Mr. Davenport was possessed of a sound and disposing mind. I have no hesitation, therefore, in concluding that during the period that

Mr. Davenport remained at the hospital, between the 6th and 16th of February, 1903, when he revoked the will which the complainant seeks to establish, he was (except during the short period of flightiness referred to by the witnesses) of a sound and disposing mind.

We come now, in the examination of this case, to the 16th day of February, 1903, that being the day on which Mr. Davenport carried into effect his frequently declared purpose to destroy the alleged will which the complainant seeks to establish. The will was, on the morning of February 16th, brought to Mr. Davenport's room by Mr. Henry Tatem, who said to Davenport, "Tom, I have brought that will." Davenport replied, "Well, I am glad you did," and, receiving it, said, "What will I do to destroy it?" Mr. Henry Tatem said to him, "Here is the signature," turning to the page which contained Davenport's signature to the will. Davenport then tore off that page of the will containing the signature and seal. At this time Mr. Henry Tatem stood at the side of the bed, Dr. Sheldon was back of him, Mr. Job P. Davenport (the son) stood at the foot of the bed. When Davenport had torn off his signature from the will, he said, "There, that is done, and I am glad of it; now the courts will have to decide it." He then went on to discuss with Mr. Henry Tatem some previous business regarding the disposal of some of his wood. All of the persons who were present when Mr. Davenport revoked the alleged will, as above stated, agree. in substance, in their narrative of the incidents which attended upon its destruction. They all agree that at that time his conversation and conduct were rational, free from excitement and entirely sane and intelligent. No testimony whatever is offered in contradiction of this evidence.

The complainant claims that the court should disregard these proofs, insisting that the evidence offered on the part of the complainant regarding Davenport's mental condition previous to his destruction of the alleged will, during all the time he was at the hospital, proves he was either insane or acting under the influence of insane delusions, and that it must be inferred that

at the time he tore off his signature to cancel the will he was mentally incapable of the act of revocation.

It is not denied that he did physically destroy the instrument by tearing off his signature intending to cancel it, but the complainant contends that his act was ineffectual to revoke the will because when he performed it Davenport was mentally incapable of conceiving a sane purpose to do that act.

The evidence regarding Mr. Davenport's mental condition during the two periods before and after he came to the hospital has been heretofore examined. All of it is significant only because it may throw light on his mental capacity at the very time he did the challenged act. The crucial question on this phase of the case is this, was Mr. Davenport at the time he tore off his signature from the alleged will, intending to revoke it, possessed of a sane mind, capable of understanding the act he was doing, and its effect?

From a period beginning very soon after he had signed the alleged will, in January, 1903, Mr. Davenport had a sense that the disposition made by that will, which gave the greater portion of his estate to the complainant, was unjust to his children. Before he went to the hospital he had directed the preparation of a new will, which corrected this wrong. The proofs show that he frequently had under consideration the question of revoking the executed will by making the new one or by canceling it. The step from executing the new will, which largely favored his children, to an intestacy, which gave his property to his children and allowed the law to settle the rights of all who might make claims against him, was a very short one.

Mr. Davenport appears finally to have determined simply to revoke the alleged will without executing the new one. The uncontradicted evidence shows that the act of revocation had been determined upon by him more than a week before he actually destroyed the will. During all that time he persistently adhered to his determination to destroy it. He constantly introduced and referred to the subject in conversation in an intelligent manner, perceiving the difficulties which stood in the way of his execution of his purpose, and insisting that Henry Tatem, who

had the will in his possession, should bring it to him in order that he might destroy it, and when it was brought to him he efficiently destroyed it by tearing off his signature.

Mr. Davenport, both before and at the time he destroyed the alleged will, referred, as is above shown, to several reasons which moved him to revoke that paper and to make a change in the disposition of his property. Those reasons were pertinently applicable to the situation of his affairs. They indicated a clear comprehension of his previous disposition of his property; a remembrance of those who were entitled to his consideration in the distribution of his estate; a perception of his duty toward his children, whom he had wronged by his abandonment of their mother, and his consequent alienation from them; a sense of the injustice of giving substantially the whole of his estate to a woman who had violated her marriage vows and broken up his family relations, and a determination by destroying that will to give his property to his children, so that whatever rights the complainant might assert should be settled by the courts. ·

The evidence uncontradictedly proves that these were the impelling causes which operated on the mind of Mr. Davenport and induced him to destroy the alleged will on the 16th day of February, 1903. A statement of them shows that whatever distortion of his moral perceptions may have induced Mr. Davenport to sign the alleged will, his destruction of it proceeded from a mental condition which was capable of comprehending and understanding every relation which was necessary to the performance of the testamentary act of revoking it and choosing instead to die intestate.

The contention of the complainant that Mr. Davenport revoked the alleged will under the influence of an insane delusion that Mrs. Alla A. Davenport was poisoning him, is not supported by either her own testimony or that of her principal witness, Mr. Palmer. The supposed delusions which they narrate, if they were ever manifested and were permanent conditions, did not indicate that Davenport believed that Mrs. Alla A. Davenport was poisoning him, or that she was unfriendly to him; on the contrary, they tended to show that other persons,

who were her and his enemies, were the supposed poisoners, &c. As Mr. Palmer states it, Davenport, speaking under the influence of these delusions, sympathized with Mrs. Alla A. Davenport, desired his will in her favor to be carried into effect and invoked Palmer's aid to accomplish that object. Such a delusion, if it in fact existed, would not have led Mr. Davenport to cancel, by his own act, the very will in favor of Mrs. Alla A. Davenport, which he asked Palmer to take care should be carried into effect.

The testimony of several other witnesses shows that Mr. Davenport spoke of his belief that he was suffering from poisoning, and to Job P. Davenport and Dr. Sheldon he said that he suspected Mrs. Alla A. Davenport. But these statements of Mr. Davenport were not accompanied by the gruesome incidents which Mrs. Alla A. Davenport and Mr. Palmer narrated. There was no reference to "poison dripping from his hands," or to "gangs of poisoners surrounding the house," &c. On the contrary, Mr. Davenport's references to the subject, as repeated by his son and Dr. Sheldon, appear to have been entirely free from any abnormal conditions. He discussed the matter in connection with related facts, the existence of which has not been disputed.

The possibility that the complainant might have been administering arsenic to Mr. Davenport in doses sufficient to have a poisonous effect was by no means so remote that belief in it, even if mistaken, can justly be designated an insane delusion.

If it is to be decided whether this belief was a delusion, the question to be determined is not whether the complainant did, in fact, poison Mr. Davenport, but whether his belief that she had done so was based upon grounds which might be entertained and considered by a sane mind in arriving at a judgment, or upon wild conceptions, the product of a diseased imagination.

It should be noted that this phase of the case, referring to Mr. Davenport's suspicion that Mrs. Alla A. Davenport might have been poisoning him, was introduced into the evidence not by the defendants but by the complainant. Her counsel's effort was to show that Mr. Davenport was possessed by an insane delusion

on this point, and to support this contention they, on cross-examination, brought into the testimony conversations in which Mr. Davenport mentioned to Dr. Sheldon and to Job P. Davenport his suspicion that the complainant had been giving him poison in milk or by way of medicine.

A short summary of the incidents which presented themselves to Mr. Davenport's mind and probably originated the belief under consideration will throw some light on this point.

Mr. Davenport's sickness had afflicted him for a long time before he came to think that Mrs. Alla A. Davenport was poisoning him. He had gradually lost his vitality. His disease is admitted to have been very obscure in its indications. The doctors radically disagreed in their diagnoses. One doctor had prescribed as a medicine Fowler's solution, which contained arsenic, and it had been administered to Mr. Davenport for some time. He grew worse rather than better. The next two doctors who attended him believed that he had been subjected to chronic arsenical poisoning, though they do not attempt to testify that it was given with criminal intent. Davenport knew, as is here undisputed, that the complainant was herself the person who had been administering his medicine. He expressed the same opinion as the two doctors, namely, that he was being poisoned, with the added suspicion that the complainant, who had been giving him his medicines, had poisoned him. In speaking to his son about this, he referred to several specific occasions (the happening of which is not denied) when sudden ill conditions immediately followed the administration of milk or of medicine by the complainant.

It can hardly be said that Mr. Davenport was possessed by an insane delusion because of his belief that he was suffering from poisoning when two of his attending doctors testify that they were of the same opinion as to his ailment.

If the two doctors and Mr. Davenport were not all insanely deluded on this point, is it clear that Mr. Davenport's suspicion that Mrs. Alla A. Davenport had poisonously administered his medicine was an insane delusion?

There is a wide gap between a mistaken conclusion, arrived at

upon consideration of existing facts which do not justify it, and a delusion which is based upon incidents existing only in the diseased imagination of the deluded party.

The complainant testifies that she did not overdose Mr. Davenport. It may be true that she did not, but it does not follow that his belief that she did was an insane delusion. He may have been mistaken in his conclusion that she had purposely overdosed him, but the facts on which he based his opinion actually existed. They were not vain imaginings created by a diseased and insane mind.

But whether Mr. Davenport's suspicion of Mrs. Alla A. Davenport was an insane delusion or a mistaken conclusion, there is no evidence that this opinion was a controlling factor which led to the destruction of the alleged will. The affirmative and uncontradicted evidence conclusively shows that Mr. Davenport destroyed that instrument because he realized the mistakes of his past life and had a sense of the injustice of giving the bulk of his estate to the complainant, to whom he appears to have made gifts of property in his lifetime, and because he wished to do justice to his family by an intestacy, which would give his estate to his real wife and children and leave to the courts the decision of any claim which might be made against him. This was a sane and reasonable determination, arrived at by Mr. Davenport after a deliberate and appreciative comprehension of every aspect of his life which ought to have influenced him in disposing of his estate.

The first intimation by Mrs. Alla A. Davenport that she was of opinion that Mr. Davenport had become insane after he had signed the alleged will in her favor appears in quite a peculiar way.

It must be remembered that Mrs. Alla A. Davenport knew the contents of the alleged will from about January 20th, 1903, when it was signed. On the following February 6th Davenport went to the hospital after she had unsuccessfully appealed to him not to go. Her friend, Mrs. Hartley, shows the first appearance of the complainant's idea that Mr. Davenport had become a lunatic. This was on February 11th at a consultation

between Mrs. Alla A. Davenport, Mr. Reber, her lawyer, and Dr. Thornton, her doctor. The question under consideration was the taking of lunacy proceedings to declare Mr. Davenport a lunatic, not for the protection of himself or his estate, but for the purpose of preventing him from changing his alleged will, which he had signed in favor of Mrs. Alla A. Davenport. Mrs. Hartley testifies that at the above-named consultation it was arranged that two specific questions should be asked; the first was, "Has any will been made—any new will been made at the hospital?" The second, "Have there been any preparations made for such a will?"

The possibility that Mr. Davenport might make a new will, unfavorable to Mrs. Alla A. Davenport, was apparently the generating force which brought into existence the notion that he had become a lunatic.

The only conclusion that can be drawn from the evidence in this case is that at the time Mr. Davenport destroyed the alleged will, intending to cancel it, he was mentally capable of executing the act of revoking that instrument, and did then effectually revoke it.

This act of revocation was done in the morning of the 16th day of February. Late in the afternoon of that day Mr. Davenport was attacked by a convulsion from which he never rallied, and he died in the early morning of February 17th, 1903.

Upon considering the whole case presented, the complainant has failed to make such proof as would justify a decree that the instrument which Mr. Davenport destroyed on February 16th, 1903, should be established as his last will and testament.

A decree will be advised that the complainant's bill be dismissed, with costs.