The petition is for the probate of an alleged lost will of Eliza A.S. Calef, who died at her summer home in Sea Bright, New Jersey, on November 25th, 1929, at the age of seventy-nine, leaving an estate having an estimated value in *Page 182 
excess of $300,000. The petition is filed by Frank Tennyson Neely, who is named as executor in the alleged will and who is also the residuary legatee and the chief beneficiary thereunder. The respondents are numerous relatives of the decedent, none of whom are of closer relationship than cousin, and others named as legatees in the alleged will. Of these respondents fourteen filed answers to the petition and decrees pro confesso have been entered against the remaining twenty-seven. The answers are all of the same purport and interpose numerous defenses, all of which, with the exception of the defenses of undue influence and revocation, were abandoned at the final hearing, the answering respondents then conceding the execution of the will, copy of which is now produced and offered for probate. The decedent is described in the brief of the respondents as a "proud and cultured woman, the widow of a railroad financier — alone in the world, surrounded only by her servants and visited infrequently by a few scattered friends." This description is undoubtedly accurate. Her husband died about 1911, leaving her with a substantial competence, which, in 1919, due to unfortunate investments, had materially dwindled. It was at this time, when she was about seventy years of age, that she met the petitioner, who was ten years her junior, and who describes himself as a "lecturer, coal broker, trader in stocks and bonds, also promoter of some promising enterprises and patents." He posed as an expert in financial matters, and previous to his meeting with the decedent, had apparently had a checkered career. He claims to have been a man of substance at this time, but this is open to question, and he had, a short time previous, gone through bankruptcy, but had, to some extent, rehabilitated himself financially. For the ensuing ten years and up until the date of Mrs. Calef's death, he occupied a position of trust and confidence toward her, and was, in his own words, "the confidential friend and adviser in financial matters," and had "full power of attorney against the funds and checking account of Mrs. Calef." He also had access to her safe deposit box at the Guarantee Trust Company of New York, and, with her, claims to have operated *Page 183 
in a joint stock account on the New York Stock Exchange. He operated in his own name but used the funds of both in his trading and there was nothing in writing to show that Mrs. Calef had any interest in any funds or securities under his control. He had evidently met with some success in conserving Mrs. Calef's assets and increasing her income, but to what extent is not definitely shown. The major portion of the estate of which she died seized she inherited from her brother, who died in 1928. During the entire period of the proponent's acquaintance with the decedent they were closely associated, Mr. Neely residing at decedent's home at Sea Bright every summer, and, at other times, traveling around the country with her or residing at the same hotel, or at a nearby hotel, in New York city, and during this whole period he assumed entire charge of Mrs. Calef's business affairs.
In view of the conclusion which I have reached in this controversy little consideration need be given to the defense of undue influence, but it should be noted, in passing, that within two years after the proponent made the acquaintance of the decedent he had obtained from her a conveyance of her Sea Bright home, her only real estate, a limited power of attorney, which was later enlarged to one conferring upon him unlimited powers over her property and affairs, and had procured the execution by her of the will here involved in which he was made her principal beneficiary and residuary legatee. The evidence indicates that Mrs. Calef was mentally capable of transacting business and continued so up until a short time before her death, but that she trusted the proponent implicitly with her affairs. The will was drafted by the proponent's lawyer, to whom he had introduced her a short time before, in the lawyer's office, and in the presence of both proponent and decedent, and was executed by the decedent in proponent's presence. Whether its execution was the result of undue influence exercised by the proponent over the decedent need not now be decided. The will was not found after the decedent's death and after diligent search for it these proceedings were instituted. *Page 184 
The law applicable to this controversy is well settled and is not in serious dispute. The general rules of law applicable will be found in 28 R.C.L. 381 tit. "Wills" §§ 384, 388; 2 Schoul.Wills §§ 779, 781, 788; 1 Underh. Wills 369 to 376 §§ 270,276; 1 Jarm. Wills § 133; 30 Am. Eng. Encycl. L. 635. See, also, notes, 38 L.R.A. 433; 50 L.R.A. (N.S.) 861;62 L.R.A. 383.
The law of this state touching lost wills will be found inBailey v. Stiles (1839), 2 N.J. Eq. 220; Hildreth v.Schillenger (1854), 10 N.J. Eq. 196; Wyckoff v. Wyckoff
(1863), 16 N.J. Eq. 401; Coddington v. Jenner (1898),57 N.J. Eq. 528; In re Willitt's Estate (1900),46 Atl. Rep. 519; Davenport v. Davenport (1904), 67 N.J. Eq. 320; In reDiament's Estate (1914), 84 N.J. Eq. 135; Campbell v.Smullen (1924), 96 N.J. Eq. 724; In re Bernhardt's Estate
(1928), 143 Atl. Rep. 92; In re Schnebel's Will (1929),141 Atl. Rep. 313; affirmed, 104 N.J. Eq. 488.
The rule of law with which we are most concerned is succinctly stated by Vice-Chancellor Reed in In re Willitt's Estate,supra, as follows:
"The rule of evidence controlling the probate of a lost or destroyed will is that the existence of a duly executed will, and its contents, must be proved with clearness and certainty. * * * When such a will is proved to have been executed, and it cannot be found at the testator's death, if the will remained in his custody, or after its execution he had ready access to it, the fact that it cannot be found after his death raises the presumption that he had destroyed it animo revocandi. * * * This presumption is rebuttable."
The presumption is one of law in some jurisdictions. Schultz
v. Schultz, 35 N.Y. 653; and of fact in others. Williams v.Miles, 63 Neb. 851; 94 N.W. Rep. 705; 62 L.R.A. 383, and note;Paten v. Poulton, 1 Swab. T. 55; 164 Eng. Rep., Full Reprint626. And the presumption of revocation must be overcome by "strong and positive evidence." Thomas v. Thomas, 129 Iowa 159; 105 N.W. Rep. 403. The proof on all points must be "clear, satisfactory and convincing." Wyckoff v. Wyckoff, Coddington
v. Jenner *Page 185 
and In re Bernhardt's Estate, supra; "strong, positive and not uncertain," 2 Schoul. § 788; "strong, cogent and convincing;" or "clear, full and satisfactory," 1 Underh. § 275; or "strong, positive and free from doubt," Newell v. Homer,120 Mass. 277; although it has been said that the proof need not be such as to remove all reasonable doubt from the mind of the court (1 Underh. § 275), but the line of demarcation between what is "clear, satisfactory and convincing" and that which removes "all reasonable doubt" is more fanciful than real.
It is contended on behalf of the proponent that immediately after the execution of this will by Mrs. Calef she delivered it to him with instructions to keep it, and that he retained custody of it continuously thereafter until it was lost; that he thought he still had possession of the will until the day before Mrs. Calef died, when he discovered that it was not in the place where he usually kept it; and that subsequent search for it has been fruitless. He claims that after delivery to him the will was never returned to Mrs. Calef; that she never had access to it, and that, therefore, the presumption of revocation by her does not arise. While admitting that the burden of proof is upon him to establish the execution of the will and its contents and the fact of its loss, he claims that possession of the will being shown to be in him as custodian, and not in Mrs. Calef, the burden is upon the respondents to trace the will back into the possession of the testatrix. But the rule is not quite as broad and exacting as is contended by counsel for proponent. The text in 2 Greenl. Evid. § 681 is:
"If the will is proved to have been in the testator's possession, and cannot afterwards be found, it will be presumed that he destroyed it, animo revocandi; but if it is shown out of his possession, the party asserting the revocation must show that it came again into his custody, or was actually destroyed by his direction."
But this must be qualified by the rule of access, or opportunity of repossession, and possibility, not probability, of such access is controlling. In re Willitt's Estate, supra; *Page 186 In re Ascheim's Will, 135 N.Y. Supp. 515; 75 Mis. (N.Y.)434. Our law, as I understand it, does not require an actualtracing of the will back into the possession of the testatrix, but is satisfied by a showing of access, that is, opportunity of repossession, and upon such showing the presumption of revocation remains until rebutted by evidence which is clear, convincing and satisfactory. It is not necessary to show either a desire or an intention to repossess. Where the custodian of a will has an interest in its destruction, less proof of its loss and contents is required. Williams v. Miles, supra. And conversely, when the custodian is the chief beneficiary of the will, as here, the presumption of revocation is more forceful, more convincing proof to rebut it should be required, and less evidence of access is necessary to sustain it, especially where non-access is shown only by the testimony of the custodian whose credibility as a witness has been impaired. In line with this thought, it has been held that proof necessary to rebut the presumption of revocation must be sufficient to exclude every possibility of a destruction of the will by the testator himself. In re Ascheim'sWill, supra. There the court said:
"Petitioner offered perhaps the best evidence obtainable, but it was insufficient to exclude every possibility of such destruction by the testatrix herself, unless I had also found a want of capacity to revoke. It is apparent in the record that there was a period when the testatrix might have visited the probable repository of the will, and at such time she had it in her power to take the will away with her if she chose. It was necessary for the petitioner to exclude every possibility of a destruction of her will by the testatrix herself. The petitioner has not excluded every opportunity of the testatrix to destroy her will, and therefore has not overcome the presumption."
In re Willitt's Estate, supra, Vice-Chancellor Reed said:
"But it is urged that in his feeble condition, during the last two weeks of his life, watched as he was almost constantly by his wife and his nurse, he could not have opened the box and destroyed the will without their knowledge. There is undoubtedly much to be said for this view, and yet he was *Page 187 
sometimes alone, and he was able to get from his bed and move from his bed to a chair and back again. It was, therefore, notimpossible for him to have got the paper." (Italics mine.)
The proponent's case may fail because of the weakness of his own proofs, rather than the strength of that of the respondent, if that weakness leaves the mind of the court unconvinced and uncertain. And the decision may turn upon the credibility of a witness. Davenport v. Davenport and In re Bernhardt'sEstate, supra. In Davenport v. Davenport, the first head note is: "That a last will and testament has been legally executed and published by the testator, will not be decreed upon uncertain and unreliable testimony."
There positive evidence of due execution of the will was given by a disinterested witness who, the court said, spoke in good faith and endeavored to tell the truth; but because of the variance in his several statements his testimony was deemed unreliable and fatal to the proponent's cause. Here the whole case depends upon testimony which, in my judgment, is uncertain, unreliable and equally fatal to proponent's cause. That testimony and other evidence submitted must now be considered at some length. For the present we will consider the matter of the delivery of the will to Neely, its continued existence and alleged custody by him up to October 27th, 1929, and Mrs. Calef's access to it during that period.
The proponent testified that the will, copy of which is now offered for probate, was executed in the office of Mr. Hume, his lawyer, in New York, on September 29th, 1921; that its execution was witnessed by Miss Wilson, now Mrs. Gorman, and Miss Beirsto, now Mrs. Taylor, who were clerks in Mr. Hume's office; that Miss Wilson was the stenographer who typed the will; that immediately after its execution the copy was completed and the original will handed to Mrs. Calef, who, in turn, handed it to Mr. Neely, saying: "This concerns you and you keep it." Mrs. Gorman says: "Mrs. Calef turned and handed it to Mr. Neely, and she said, `Here Mr. Neely, this concerns you; you might as well keep it;'" *Page 188 
and Mr. Hume testified that "she turned to Mr. Neely and handed the will to him with the remark, I think it was, `This concerns you. You keep it.'" Mr. Neely claims that he then placed the will, which was enclosed in one of Mr. Hume's business envelopes, in his pocket, and that he thereafter kept it with other valuable papers in his possession in various repositories, but that it was usually kept in a small traveling bag which he carried around with him from place to place and which he kept in his room at Sea Bright during the summer seasons. That he had the will in his possession in the summer of 1922 is shown by the testimony of the witness Avery, a New York lawyer who had been retained by Mrs. Calef in connection with some controversy over her seashore property. Avery testified that Neely brought to his office a package of papers containing title abstracts, deeds, the will in question and also Mr. Neely's will, in which Mr. Avery says Mrs. Calef was named as residuary legatee. This circumstance casts doubt upon the accuracy of Neely's testimony, as he says he made this will in Florida during the winter of 1922-1923, and also that he executed it at 15 Liberty street, New York City, about four months after Mrs. Calef made her will. I need not decide which is the truth. But so far as the evidence shows, that was the last time that anyone actually saw Mrs. Calef's will. Neely and Avery both say that the package of papers was returned to Neely some few weeks later. Neely says that he kept Mrs. Calef's will in the original envelope, which he sealed, after putting in his own will, and marked "Wills," and enclosed it with other papers in a larger envelope, which was sealed, and which he carried around with him in his traveling bag; that from time to time after 1922 he saw the envelope containing the will but never saw the will itself, and that as late as June, 1929, he saw the envelope and that it was in his bag at that time. That was the last time that he claims to have seen the envelope. The continued existence of the will is attempted to be shown by the testimony of Neely and his two New York lawyers, Hume and Fuller. Hume testifies that during the summer of 1929 he received a verbal message from Mrs. Calef, *Page 189 through Mr. Neely, to the effect that she wanted him to come to Sea Bright for the purpose of adding a codicil to the will which he had previously prepared. This testimony was received over the objection of defendants on the ground that it was a self-serving declaration and hearsay. I received it subject to its being later stricken from the record and remarked at the time that it should be given very little weight. Its obvious purpose was to show the continued existence of the will up to the summer of 1929 and Mrs. Calef's knowledge of it. The testimony should be excluded, as it is dependent entirely upon a statement alleged to have been made by Mr. Neely to Hume; but even if it were admissible, it is of very little importance. The only other testimony indicating the existence of the will in 1929, aside from Neely's, was that of Mr. Fuller, who testifies that on October 27th, 1929, Mrs. Calef discussed with him the matter of adding a codicil to her will, altering slightly the disposition of her property, and then referred to an existing will in Neely's possession; that she was then ill as a result of an automobile accident and was confined to the house, but that she finally decided to await her return to New York, which was intended in November, before having the codicil prepared, as the facilities for that work were better there. That Mrs. Calef did contemplate some change in the disposition of her property after the death of her brother in 1928 is plain and is admitted by the proponent. In the fall of 1928, at her request, Neely had reconveyed the Sea Bright property to her because, as he says, there was no occasion for him to retain the title any longer as his money advances to her had then been repaid, and she desired it because she thought it would look better to have title in her name. Neely's testimony, considered in connection with his affidavit filed in support of the petition for probate, is so inconsistent, shifting and evasive that I regard it as almost totally unreliable. It is in some particulars in direct conflict with that of witnesses whose truthfulness and disinterestedness cannot be questioned. It is particularly in conflict with the testimony of Judge Truax and Mr. Reussille, two reputable members of the bar of this state, *Page 190 
and totally disinterested. His testimony is also in direct conflict with that of Mrs. Reed, of Mrs. Bouse, and, on one point at least, with that of his own witness, Mrs. Clark. He testified that Mrs. Clark introduced Mrs. Calef to Mr. Hume, but this is flatly denied by Mrs. Clark and I think other circumstances indicate clearly that the introduction was by Neely himself. He has testified at least two ways on almost every vital point in the case. He has testified that he kept the will in his traveling bag continuously, and that he did not; in his affidavit filed with the petition for probate he said that after receiving the will he took it to his apartment in New York and filed it away with certain other legal papers; in his answer to cross-interrogatory forty-six he admits that he had no apartment in New York at that time, and then states that he was not sure whether he had such an apartment or not; and, finally, that he was living at Mrs. Calef's home in Sea Bright, to which he returned on the afternoon of the day on which the will was made; that he immediately put the will in a safe deposit box in a bank, and that he did not do so. He named at least six or seven banks and as many hotels where he either had or might have had safe deposit boxes and in which he might at times have kept the will. But I think it extremely doubtful if he has any reliable knowledge as to where the will was at any particular time. His invariable answer was that it might have been in such and such a place. But it cannot be denied that he never actually saw the will itself after 1922 when he had it in Mr. Avery's office. He also stated that Mrs. Calef knew that the will was in the traveling bag, and that she did not; that he saw the will frequently between the date of its execution and 1929, and that he did not; that he discussed the will with Mrs. Calef between those dates and that he did not. If he ever had it in his possession after 1922, which I very much doubt, it is singular that he cannot definitely name any repository of it during the ensuing seven years, except the now famous traveling bag in which he claims to have kept his own and many of Mrs. Calef's private and valuable papers. Sane persons, and especially astute business men of the type which *Page 191 
Neely professes to be, do not usually carry their wills, or the wills of others in which they have a substantial interest, around the country in their pockets or in their traveling bags, particularly where they are maintaining so many safe deposit boxes in responsible financial institutions, as he alleges he did. The usual repository for such valuable papers is a bank, and it is reasonable to assume that a woman of Mrs. Calef's reputed mental caliber would do with her will what any other reasonably prudent woman would do, i.e., place it in her safe deposit box at the Guarantee Trust Company, where, indeed, Neely looked for it after her death. Justifiable inferences to the effect that the will had, to the proponent's knowledge, disappeared and was destroyed long before Mrs. Calef's death, arise from Mr. Neely's frantic efforts to procure the execution of a new will by Mrs. Calef during the period immediately preceding her demise. Fuller made three trips to Mrs. Calef's home for this purpose. On the first trip he was unable to see Mrs. Calef because of her physical condition resulting from an automobile accident; on the second trip, in October, he says he consulted with her about the drafting of a "codicil;" and on the third trip he arrived too late, as death had intervened. In the summer of 1929 preceding Mrs. Calef's death, Neely endeavored to have Hume come to Sea Bright for the purpose, as he expressed it, of "drafting a codicil" to the old will. The effect of this testimony about "codicils," obviously intended to show the continued existence of the will drawn by Hume, is, to say the least, greatly weakened by the testimony as to the events now to be recited. The day before Mrs. Calef died Judge Truax was hurriedly called by telephone. He prepared, at Neely's request, a draft of a will which it was proposed she should execute, making Neely her sole beneficiary. Because of Mrs. Calef's condition Judge Truax very properly would not permit any attempted execution and left the house. He was called back later on the same day, but found Mrs. Calef in a comatose condition and again left without any attempt to have her execute the will. Notwithstanding this situation, Neely and Miss Fahrner, the seamstress, asked the *Page 192 
nurse, Mrs. Bouse, to place the pen in Mrs. Calef's hand and guide her hand in the making of a signature. This, of course, is denied, but I accept the testimony of Mrs. Bouse, who has no interest whatever in the matter and no incentive to falsify. On the morning of the day on which Mrs. Calef died, Neely hurriedly called another lawyer, Mr. Reussille, of Red Bank, to prepare a will for Mrs. Calef; but before Mr. Reussille had even seen the decedent, and while he and Neely were in conversation, the nurse announced Mrs. Calef's death. The testimony concerning what happened upon the visits of Judge Truax and Mr. Reussille is interesting and enlightening. From the condition of the house it was quite evident to Judge Truax that a search for some missing document had been made before his arrival. He says that on his first visit Neely told him that a New York lawyer had drawn a will for Mrs. Calef to sign and also one for Neely to sign, and that Neely then looked through a satchel while he was there and found two drafts of wills, "one was for him to sign — I don't know about the other." Nothing was said about a previously executed will of Mrs. Calef's which had been lost. "He said he couldn't find a will that was drawn by this attorney in New York." "He said it was a will drawn for her to sign." Judge Truax was again there later that day, about five-thirty in the afternoon, and remained until seven. This was on Sunday, the day before Mrs. Calef died. Late that afternoon Neely telegraphed Fuller: "Will you not come by train to Sea Bright. Extremely urgent." Fuller left his home in New York State by automobile about eight P.M. and drove to Sea Bright, a distance of over four hundred miles, arriving there the next day after Mrs. Calef's death. He found Hume already there, but he, too, had arrived too late. Mr. Reussille was called to the Calef home by Neely that morning "on a matter of life and death." On his arrival, Neely told him that he had been searching Mrs. Calef's effects for a will but had been unable to find one. It was not indicated to Mr. Reussille whether the search was for an executed will or a draft of a will to be executed. *Page 193 
It will be recalled that during the summer Neely had some communication with Hume and Fuller about drafting a codicil to Mrs. Calef's will. Was it a codicil? And if we turn to Fuller's testimony we find that he actually did draw a new will for Neely immediately after his October visit and sent it, with a copy, to him by mail on November 2d. He says that on October 27th, 1929, he discussed the proposed codicil to her will with Mrs. Calef. Was it a codicil? He says its preparation was deferred. But, was it? When Judge Truax arrived at the Calef home Neely had been searching for wills which had been prepared by a New York lawyer, but had not been executed. He had found one, his own, but not the other which was to have been executed by Mrs. Calef. Had Fuller made a mistake and prepared a draft of a new will for Mrs. Calef, and sent it to Neely with a draft of his, Neely's, proposed new will on November 2d, and forgotten about it? Evidently somebody had prepared such a draft for Mrs. Calef and Neely in his extremity could not find it. Had he found it he need not have called Judge Truax, or Fuller, or Hume, or Reussille; he would have needed no other draft for Mrs. Calef to execute. The one he was looking for, had he found it, might have been executed by her while she was yet "mentally alert," these four lawyers would have been saved the inconvenience of their hurried trips to the Calef home, and this controversy would never have come before the court. And this leads to the question: Had not both Mrs. Calef's and Mr. Neely's wills, which Avery saw in 1922, been long since destroyed? And is not that the explanation of all this talk about new wills and codicils after the death of Mrs. Calef's brother? If this will, copy of which is now offered for probate, had not, to Neely's knowledge, been destroyed, why all these frantic efforts to have a new will executed? As early as the first part of October, Neely had requested Mrs. Reed, the wife of Mrs. Calef's physician, to use her influence with Mrs. Calef to induce her to make a will in Neely's favor, and to ask Dr. Reed to use his influence also. It was to deny this testimony on the part of Mrs. Reed that Neely was called before the court in rebuttal and asked the one question on *Page 194 
direct examination. Mrs. Reed is a lady of culture and refinement, a disinterested witness, with no incentive to falsify, and I believe she testified truthfully. Of one thing we may be sure; the will was not in existence at Mrs. Calef's death. If it had been in Neely's custody, as he said, he would have found it on November 24th, the day before Mrs. Calef died. But let us assume, for the moment, that the will was in Neely's custody, as he says it was. The bag in which he claims it was kept was in his room, unlocked, and, without a doubt, easily accessible to Mrs. Calef. In fact, he admits that anyone who wanted to do so could have opened the bag and taken from it the will or any other papers that he had therein, at any time during the summer periods when he had the bag at the Sea Bright house. As against this possibility what is there to show that she did not do so? But Neely says that the bag was on top of the wardrobe and that Mrs. Calef could not get it without getting up on a chair or stepladder, a perilous feat for such an aged lady. But Mrs. Megill, the servant, says the bag was on the floor of the closet and she had to move it in cleaning the room. Why should she lie about it?
There are compelling reasons here for not giving the word of Neely an absolute right of way. All of his testimony respecting custody of the will and access or opportunity to repossess by Mrs. Calef, and, in fact, almost his entire testimony, is such as could be denied by no one except Mrs. Calef. And her voice is silenced by death. Neely has undoubtedly testified falsely in some particulars. "Falsus in uno, falsus in omnibus." And while I need not, of course, discard all his testimony, I have no hesitancy in saying that I place very little reliance upon it. But, in reaching this conclusion, I have not considered nor been influenced by the testimony concerning Neely's indictment. That was received by the master over the objection of proponent's counsel and will be stricken from the record.
Some point is made in the brief of counsel for respondents of the fact that the proponent did not appear in open court for the purpose of testifying in the cause but that his entire *Page 195 
testimony, with one exception to be presently noted, was taken by deposition before a master or commissioner on the representation that he was too ill to appear in court; but, it is argued, he was not too ill, during this time, to travel from New York to Florida, to Michigan, to Minnesota, back to New York, to Florida, to New Hampshire and back again to Florida. Authority for the taking of such depositions was given upon representations that proponent's physical condition would not permit him to appear in court, and no objection on the part of respondents was made at the time the orders were issued. Upon the completion of the testimony of other witnesses, permission was asked on behalf of the proponent to produce him in court for the purpose of asking him one single question in rebuttal, and he was produced, as counsel for proponent says in his brief, "in order that the type and kind of man he was might be physically seen by the court." So far as the eye or ear could detect there was nothing to indicate any physical disability on the part of proponent which might have prevented his appearing in court at his will, and otherwise the court remained unimpressed. There is undoubtedly some justification for the criticism of counsel for the respondents, but it comes rather late, and if the court has obtained a wrong picture of proponent from the record before the master, as may be contended, the proponent is himself alone responsible for it.
Nor is Fuller's testimony to be accepted at its face value any more than is that of Neely. Fuller is entirely too much interested in this controversy to be an impartial witness. He has, if anything, taken a more lively interest in the affair than Neely himself; at least so far as could be observed by the court. I do not recall that he missed any sessions of the court when any testimony was taken. He attended before the commissioner as counsel for Neely at the time of Neely's deposition in Albion, New York, and later, when it was found that these depositions were defective, he went to the commissioner's office with Neely, and, without any notice to opposing counsel, with the commissioner, attempted to revamp these depositions, but due to their admitted defects, they *Page 196 
were excluded from the record. He was present at the taking of Neely's deposition in Miami, Florida, which covered a period of over a week, and attended every session before the master, acting as counsel for the proponent. Although not recorded as such by the master, it so appears from opposing counsel's statement on the record which was not denied by either Neely or Fuller. He has been a bosom friend of the proponent for many years, visiting him from time to time at Mrs. Calef's home in Sea Bright, and in the fall of 1929, with an alacrity worthy of a younger man, responded to Neely's urgent calls, as already related.
Mrs. Gorman testified on January 12th, 1931, over nine years after the event, freely and without any hesitation whatever, about the entire transaction respecting the drafting and execution of the will, relating conversations verbatim and giving the exact words used by Mrs. Calef when handing the will to Mr. Neely. This shows a remarkable memory, to say the least.
Mr. Hume's testimony respecting the circumstances surrounding the drafting of the will and its delivery to Neely is equally particular and in detail, and he repeats almost the exact words quoted by Mrs. Gorman and by Mr. Neely himself; but Hume is not a disinterested witness. His testimony, aside from the question of the execution of the will by Mrs. Calef and delivery of it to Neely, is unimportant; but he is one of proponent's counsel and his activities in the case are evincive of more than ordinary interest.
Avery was a disinterested witness and there is no suggestion that his testimony was not truthful, but it is unimportant except to show that Neely had the will in 1922, and the unreliability of Neely's own testimony. Under the circumstances, Neely's possession of the will at that time is not at all remarkable. The package of papers "looked like the contents of a safe deposit box." Quite likely Mrs. Calef's, to which Neely had access. Avery's testimony respecting the declarations of Mrs. Calef in 1928 had no reference to the will.
Clearly, the proponent's case must stand or fall by his own testimony and that of his two New York lawyers, Hume *Page 197 
and Fuller, who are his main supports. Without their testimony respecting delivery and custody of the will, the whole case would fall. They are all biased and interested witnesses. Neely is the chief beneficiary of the will. Hume and Fuller are the guiding hands in this controversy. Both have acted in the dual capacity of witness and counsel, and they were over-zealous. In the last analysis, as already indicated, Hume's testimony is not important, and it might be given full credence, and yet, proponent's case must fail because of the unreliability of his testimony and that of Fuller. Both are in the discard.
If the will had been lost or destroyed on November 24th, the day before Mrs. Calef died, who is responsible? It is not suggested that Neely is; he would be the last person in the world to make away with it, as he is the person most interested in preserving it. It will not be presumed that any one other than Mrs. Calef took the will and destroyed it, because to do so would be to presume a crime (28 R.C.L. tit. "Wills" § 388), and there is no evidence whatever indicating any motive or opportunity for destruction of the will by any one except Mrs. Calef herself. There were long years intervening between the execution of the will and the testatrix' death, during all of which time she must, in view of the relations of the parties, have had the opportunity to repossess herself of it; but it may be assumed that she was content to let the matter rest as it was until her change of financial circumstances in December, 1928. After that date her opportunities for repossession of the will were at least as great as before, and I have no doubt that the will would have been returned to her by Mr. Neely, if he still had it, upon her simple request that he do so. He alone says that the request was not made. Who can deny it now? It is not unreasonable to believe that, contemplating such change, she requested the return of the will and destroyed it.
Thus far I have dealt with the question of custody of the will and access thereto by Mrs. Calef as of the period prior to October 27th, 1929. That is the last date with respect to which any evidence was offered tending to show the continued *Page 198 
existence of the will or custody thereof in the proponent. Subsequent to that date, and up until November 16th, at least, I think it is plain that Mrs. Calef had ample opportunity to repossess herself of the will had she so desired. As late as October 25th, 1929, Mrs. Calef signed a contract for sale of property in which she had inherited a one-half interest from her brother and she telegraphed to Mr. Tarr, the Massachusetts attorney, on that day, that she had executed the contract and returned it. This was only two days before the alleged conversation with Fuller in reference to a proposed codicil, and indicates power of revocation and sufficient grasp of her affairs to have formed an intention to revoke and carry it out at that time if she had not already done so. If Mr. Neely had the will, she undoubtedly knew where it was. She knew that he carried his valuable papers around in the traveling bag which he so frequently mentions. She must have known where that bag was. Even the servants in her house knew. If she had desired to repossess herself of the will she could have done so. In the Willitt Case
the decedent had executed a will and placed it in a small wooden box, nailed the wooden cover down securely and wrapped it in paper and placed it in a bookcase in his father's home. Ten days before his death, while he was confined to his bed, he requested that the box, which contained valuable papers, be brought to him and it was so brought and placed under his bed. There was no evidence indicating that he ever opened the box or that it had ever been unwrapped, and yet, after his death, the will was not found therein. It was there held that "it was not impossible"
for the testator to repossess the will and that, therefore, the presumption of revocation must prevail.
In the instant case it cannot be said that it was "impossible" for Mrs. Calef to have possessed herself of the will and destroyed it after October 27th, 1929, nor is it to be assumed that her only opportunity for doing so occurred after that date. Both her physical ability and opportunity of repossession were much greater than the testator had in the Willitt Case. There is no doubt in my mind that the will had *Page 199 
been destroyed long prior to October 27th, 1929, but, for the purpose of this decision, it may be admitted that the will was duly executed; it was delivered to the proponent; he retained possession of it continuously thereafter until October 27th, 1929; until then it was Mrs. Calef's intention that that will should become effective upon her death; there was no undue influence used in procuring the execution of that will; and that the relations between Mrs. Calef and Mr. Neely were all that he claims and continued to be so until the end.
But I think it must be conceded that Mrs. Calef knew where the will was, even if she did not have the custody of it; she could, if she so desired, have obtained possession of it and destroyed it, at least after October 27th, 1929, and before November 16th, 1929, there being no doubt about access during that period; the will could not be found after her death; change in circumstances which might have prompted revocation; and actual consideration of the disposition of her property in a manner different from that provided for by the will in question.
The presumption of destruction by the testatrix, animorevocandi, therefore prevails and the petition for probate will be dismissed. *Page 200