ESSEX COUNTY ORPHANS COURT.

IN THE MATTER OF THE ESTATE OF PHILIP BLOCK, DECEASED.

Decided February 24, 1937.

For the petitioners, *Harry Dudkin.*

For the respondent, *Benjamin Cohn.*

HARTSHORNE, C. P. J. We have here for consideration the "somewhat difficult question of the effect of the cancellation of a later will upon an earlier one." *Re Diament's Estate,* 88 *N. J. Eq.* 552; 103 *Atl. Rep.* 199. Unfortunately the Court of Errors and Appeals did not find it necessary to answer such question in the above case, and in the two other leading New Jersey cases on the subject (*Randall* v. *Beatty,* 31 *N. J. Eq.* 643; *Re Moore's Will,* 72 *Id.* 371; 65 *Atl. Rep.* 447) it is far from clear whether the courts apply the rule originally adopted by the English courts of common law or the differing one adopted by the English ecclesiastical courts, for both are referred to. Turning from the New Jersey courts to outside jurisdictions we find "confusion worse confounded." For in England at first the common law courts adopted one rule, the ecclesiastical courts another, and later upon the enactment of the

Statute of Victoria as to wills, a third was fixed upon. Statute of Victoria, 1837, 7 *Wm. IV* and 1 *Vic., ch.* 26, § 22. Turning to this country we find that one group of courts has followed the English common law rule (Connecticut, Illinois, North Carolina, Rhode Island, Vermont), another group the rule of the English ecclesiastical courts (Iowa, Maryland, Massachusetts, Michigan, Minnesota, New Hampshire, Pennsylvania), a third the English rule adopted under the Statute of Victoria (California, Indiana, Kansas, Missouri, New York, Ohio), while two other groups diverge still further. 1 *Page on Wills* (*2d ed.*), ¶¶ 442 to 448. To understand more clearly the difficulties which have thus caused our courts to differ so variously, the typical facts, appearing in this case, should be borne in mind.

Philip Block executed his first will in 1922, leaving same with his then attorney, Benjamin Yawitz, to keep for him. This will is now produced by the attorney for probate. In 1928 testator returned to his attorney and executed a second will, telling the latter to keep both because "I want to see how the children are going to act towards me." There is a dispute as to this, a son claiming that at or about the time of the execution of the 1928 will the 1922 will was thrown by Yawitz into the scrap basket in testator's presence. But not only do we have the attorney's denial of this, but that of several disinterested witnesses, who say no such thing occurred and that the son was not present at the execution of the 1928 will. Later the decedent obtained his 1928 will from his lawyer and took it home, where he kept it till a few months before his death, in his safe. To this safe only he and this son had access. The 1928 will was not found after decedent's death, and there being no motive for the son's destroying it, and no testimony even hinting same, it is well established that the 1928 will must be deemed to have been destroyed by testator *animo revocandi*. *Re Calef*, 109 *N. J. Eq.* 181; 156 *Atl. Rep.* 475; *affirmed*, 111 *N. J. Eq.* 355; 162 *Atl. Rep.* 579; *Re Willett's Estate*, 46 *Atl. Rep.* (*N. J.*) 519.

So far the situation creates small difficulty. The real difficulty arises due to the fact that the 1928 will, a copy of

which exists, contained a clause expressly revoking former wills. The question thus is, whether the 1922 will now produced by decedent's attorney, Mr. Yawitz, is in effect, despite the execution of the later will containing the revocation clause, and the latter's revocation subsequently.

According to the rule of the English common law courts, as stated in *Randall* v. *Beatty, supra,* "where one will is revoked by another, the revocation is testamentary, and the revocation of the latter will revives the former." According to the rule of the English ecclesiastical courts, apparently applied in *Re Moore's Will, supra,* the revocatory clause included in the later will takes effect at once, on execution, to revoke the earlier will, it being a question of testator's intention as to whether or not the earlier will is revived by the subsequent destruction of the later will. Both these differing viewpoints are well set forth in *Whitehill* v. *Halbing,* 98 *Conn.* 21; 118 *Atl. Rep.* 454, with their supporting and conflicting authorities throughout the United States, exhaustively, not to say exhaustingly, discussed, if we may judge from the language in the dissenting opinion of the Supreme Court of Errors of Connecticut, where the Chief Justice takes pointed issue with his colleagues. The third major rule is that adopted by the English courts subsequent to the enactment of the Statute of Victoria, *supra,* in 1837. *Major* v. *Williams,* 3 *Curt. Ecc.* 432; 1 *Page on Wills,* § 446. This rule, which has in turn been followed by another series of American state courts, is to the effect that the execution of a later will, with a revocatory clause, revokes the first, but that, on the revocation of the later will, the earlier will is not revived unless re-executed and republished.

To guide our footsteps in this confusing situation the following landmarks stand out:

1. The devolution of property at death is a matter of such importance both to the individuals involved and to the public, and so subject to possible fraud when the lips of the previous owner have been sealed by death, that the public, through the legislature, has fixed definite rules as to how property may so pass.

2. The intention of the testator is important, but in view of such danger of fraud, the evidence of such intention must be definite, and ofttimes of statutory character.

3. Wills are ambulatory in character, *i. e.,* speak only from date of death.

4. The law abhors intestacy.

Before the establishment of the above rules by the courts and their general recognition as landmarks, a duly executed will could be revoked by mere word of mouth. This was soon found so uncertain and subject to fraud that provisions were inserted in the statute of frauds as early as 1687 to prevent such oral revocation of a will. 29 *Car. II,* ch. 3, §§ 6, 22. These provisions of the English statute of frauds have been re-enacted substantially *verbatim* in the New Jersey statute of wills and now constitute sections 2 and 25 of such statute, as follows:

"Sec. 2: That no devise or bequest in writing, of any lands, tenements, hereditaments or other estates whatsoever in this state, or of any estate *pur auter vie,* or any clause thereof, shall be revocable, otherwise than by some other will or codicil in writing, or other writing declaring the same, or by burning, canceling, tearing or obliterating the same by the testator himself or in his presence, and by his direction and consent; but all devises and bequests of any lands, tenements, hereditaments, or other estates whatsoever in this state, or of any estate *pur auter vie,* shall remain and continue in force until the same be burnt, canceled, torn or obliterated by the testator or by his directions in manner aforesaid, or unless the same be revoked or altered by some other will or codicil in writing, or other writing of the devisor signed in the presence of three or more subscribing witnesses declaring such revocation or alteration.

"Sec. 25: That all written revocations of wills shall be executed in the same manner as wills are hereby required to be executed, and when so made shall be sufficient to revoke any last will, or any part thereof." 4 *Comp. Stat.* 1910, *tit.* "*Wills,*" *pp.* 5861, 5870.

It will first be noted that these sections do not speak of

revivors, but only of revocations. On the other hand, the Statute of Victoria above alluded to, not enacted in New Jersey, does speak of such revivors. "And be it further enacted, that no will or codicil, or any part thereof, which shall be in any manner revoked, shall be revived otherwise than by the re-execution thereof, or by a codicil executed in manner hereinbefore required, and showing an intention to revive the same; and when any will or codicil which shall be partly revoked, and afterwards wholly revoked shall be revived, such revival shall not extend to so much thereof as shall have been revoked before the revocation of the whole thereof, unless an intention to the contrary shall be shown." 7 *Wm. IV* and 1 *Vic., ch.* 26, § 22 (July 3, 1837).

It will be noted next that the first of the above quoted sections of the New Jersey statute applies to real estate only, the second to personalty as well as realty. It will be noted further that the first of the above sections of the New Jersey statute sets forth three classes of revocations of wills: first, by another written will or codicil, second, by a different kind of written revocation, *i. e.*, a deed of revocation, third, by the physical acts of "burning, canceling, tearing or obliterating." On the other hand, the second of the above quoted sections of the New Jersey statute applies only to written revocations. Clearly, the physical acts of burning, canceling, tearing or obliterating take effect at once. Equally clearly, a deed of revocation takes effect on execution, at least in the absence of clear evidence of escrow. But a revocation by will is, after all, by will. And it is their "ambulatory quality which forms the characteristic of wills." 1 *Jarm. Wills* (*6th ed.*) 18, &c., *i. e.*, such will takes effect only at death. It scarcely comports with logic or legal theory, to say that the one instrument executed at the one time takes effect at two times, in part on execution, in part at subsequent death. And this fact that wills take effect only at death is so well known, even to the layman, that his actual intent can hardly differ with legal theory, particularly when acting on the advice of counsel. He knows that his statement in the will, "I give, devise, and bequeath" takes effect

not when he says it, but at his death. So he can hardly intend his words as to revoking previous wills, to take effect at a different time.

It should be finally noted that section 25 of the New Jersey statute of wills above quoted is not, as is section 2 of such statute, in the exact form of the English statute of frauds, *supra*. Section XXI of the English act was incorporated *verbatim* in the New Jersey Wills act down through 1847 (Rev. 1821, page 223, section 17; Rev. 1847, chapter 9, page 361, section 16). Four years later, however, the legislature put such section in its present term. *Pamph. L.* 1851, *p.* 218, § 2. As such section originally existed, it covered merely the method of execution of written revocations of wills of personalty, its original phraseology setting up a special statutory method. The obvious purpose of the change to the present form was to eliminate this special statutory method or form of execution, and to make it comply with the immediately preceding section of the same act, setting forth the method of execution of wills themselves. Since the section concerns itself with form, the provision in the present section as to revocation means not that they shall be *efficient* to revoke at the *time* they are so executed, but that they shall be *"sufficient"* to revoke when they are made in such *form*. For the statute does not say that they "when so made shall revoke," but that they "when so made shall be sufficient to revoke," in accordance with testator's intent. In other words, if such written revocation is by deed, then on execution, but if by will, then at death.

Evidently with this view of the effect of the English statute of frauds in mind, Lord Mansfield laid down the English common law rule in *Goodright* v. *Glazier*, 4 *Burr.* 2512, in 1770, as follows: "A will is ambulatory till the death of the testator. If the testator lets it stand till he dies, it is his will; if he does not suffer it to do so, it is not his will. Here, he had two. He has canceled the second: It has no effect, no operation; it is as no will at all, being canceled before his death. But the former, which was never canceled, stands as his will." This is both the origin and the essence

of the so-called common law rule as to revivor of wills, restated in *Randall* v. *Beatty, supra.* But it will be noted that Lord Mansfield says nothing whatever about revivor. In truth, in the light of this rule, to speak of revivor is a confusion in terms. For there is no revivor. If the second will, containing the revocation clause, is destroyed before death, it never took effect. If it never took effect, it could not have affected the first will. If the first will has not been affected, it stands, as executed, without any revivor.

But the English ecclesiastical courts were not content with the unassailable logic of this rule, and with its consonance, on the one hand with the actual intent of testator in view of the well known ambulatory quality of wills, and on the other with the will of the English people as embodied in their statute of frauds. They insisted, as do many American courts, that a will with a revocation clause takes effect not once but twice, the revocation portion on execution; the testamentary portion at death. Exactly why they reached this peculiar result most of such decisions do not explain. Most rest upon the authority of previous cases. Some say that it accords with the actual intent of the testator. But the average testator certainly knows the difference between a will and a deed, and this difference proves their view as to his intent to be in error. The most that can be claimed is that the revocatory clause shows testator's intention to revoke at the time he wrote it. But, to constitute a revocation in fact, this intention must obviously be made effective. As aptly said in the similar case of *Cheese* v. *Lovejoy,* 25 *Weekly Rep.* (*Eng.*) 853, "all the destroying [of a will] without the intention will not revoke it; nor all the intention in the world without the destroying [or other effective revocation] there must be the two." But this alleged intention to revoke at once, by the revocatory clause in the will, which is probably incorrect in fact as above noted, cannot be made effective until the will of which it is a part becomes effective, *i. e.,* at death. Indeed the statute itself is to this effect. As to revocation by will, it provides for such revocation, not by the writing of a clause *in* a

will, but "by some other will" *itself*. That the ecclesiastical rule is illogical is evident. Nevertheless, the ecclesiastical courts (*Uslicke* v. *Bawden*, 2 *Add. Ecc.* 116), having thus held the earlier will to have been revoked by the later will, subsequently destroyed, found themselves between Scylla and Charybdis and faced with an intestacy which they abhorred, despite the existence of a duly executed will before their very eyes. To extricate themselves from their difficulty they thereupon invented the novel legal theory of revivor. And from that day the trouble began.

That this novel, fine spun legal theory, which has caused so many complications, was unnecessary, is obvious on a consideration of the common law theory; that its complications are regrettable, every court will agree which has struggled with the proposition, no matter which one of the three or more variant rules such court has finally adopted. But, of course, the application of the common law rule to the facts is not always as simple as it was in the early and leading case dealt with by Lord Mansfield, *supra*. For, in addition to the question as to the revocation of the later will, which he there dealt with, the courts must ofttimes deal with the question of the possible revocation of the earlier will, due to facts surrounding it, and not the later will. Such was the situation, for instance, in *Moore's Will, supra,* where the evidence showed not only that the later will had been revoked, but that the earlier will had been practically thrown away by testator and partly burned. Under such circumstances, applying the statute of frauds as it existed in England and as it exists in New Jersey in our statute of wills, *supra,* we find the earlier will to have been revoked itself by such burning. Thus, whether we apply the illogical ecclesiastical rule or the common law rule based upon the statute of frauds, the result is identic.

Since the Statute of Victoria, *supra,* which alone of the statutes mentions the "revivor" of wills, is not in effect in New Jersey, the New Jersey courts need not be embroiled in this contention over the revivorship of wills either because of such statute or because of the unnecessary and illogical

theory of revivorship created in their despair by the English ecclesiastical courts. The question is not one of revivorship at all. It is a question of revocation pure and simple. Furthermore, it is a question of revocation in accordance with the principles fixed in that regard by the people of this state through their legislature. Bearing in mind our landmarks, as to the importance of the devolution of property on death and the public's consequent control of same, bearing in mind the desire to effectuate testator's intent, but only so far as such statute permits, and as well the indispensable ambulatory character of wills, we can, in a situation such as the present, reach our goal in a direct course. In the light of the above provisions of the New Jersey statute as to revocation and not revivor, we consider first whether the later will has been revoked or not. If not, it stands, its revoking clause is effective, and the earlier will is revoked. If, on the other hand, the later will has been revoked under the statute, then we consider whether the earlier will has been revoked, under the circumstances surrounding it. If it has been revoked, in one of the ways provided for by the statute, or it cannot be proven because it cannot be found, there is intestacy. But, if not so revoked, it stands. This method, so simple as compared with the confusing, complicated, conflicting revivorship rules, has the further merit, that it embodies on the one hand the basic ambulatory theory of the above common law rule, and on the other the basic intent theory of the above ecclesiastical rule, in so far as the will of the people, expressed in the statute of frauds, permits evidence in that regard, sufficiently reliable to control such an important occasion.

Applying these simple principles to the case at bar we reach the result that (1) the presumed destruction of the 1928 will revoked it; (2) the destruction of the 1928 will before testator's death prevented its revocation clause from taking effect; (3) the 1922 will having been preserved in a safe place for testator at his direction, was not revoked by him. Therefore, the 1922 will, now in evidence, will be admitted to probate.